Walter F. Eggers, III, WSB No. 6-3150
HOLLAND & HART LLP
2515 Warren Ave., Suite 450
Cheyenne, WY 82001-1347
Phone: (307) 778-4200
weggers@hollandhart.com

John F. Shepherd, *pro hac vice*
Tina Van Bockern, *pro hac vice*
HOLLAND & HART LLP
555 17th Street, Suite 3200
Denver, CO 80202
Phone: (303) 295-8000
jshepherd@hollandhart.com
trvanbockern@hollandhart.com
*Attorneys for Petitioner Cloud Peak Energy Inc.*

R. Kirk Muller, WSB No. 5-2420
Gail L. Wurtzler, *pro hac vice*
Kathleen C. Schroder, *pro hac vice*
DAVIS GRAHAM & STUBBS LLP
1550 Seventeenth Street, Suite 500
Denver, CO 80202
Phone: (303) 892-9400
*Attorneys for Petitioner Tri-State Generation and
Transmission Ass'n Inc.*

Keith S. Burron, WSB No. 5-2884
The Burron Firm, P.C.
1695 Morningstar Road
Cheyenne, WY 82009
Phone: (307) 631-7372
keith@burronlaw.com

Peter J. Schaumberg, *pro hac vice*
James M. Auslander, *pro hac vice*
BEVERIDGE & DIAMOND, P.C.
1900 N St., N.W., Suite 100
Washington, DC 20036
Phone: (202) 789-6009
pschaumberg@bdlaw.com
jauslander@bdlaw.com
*Attorneys for Petitioners American Petroleum
Institute, National Mining Association, and
Wyoming Mining Association*

Rex E. Johnson, WSB No. 5-1845
Brian D. Artery, WSB No. 7-4819
SHERARD, SHERARD, ARTERY &
JOHNSON
602 10th Street
Wheatland, WY 82201
Phone: (307) 322-5555
rex@ssjwyolaw.com
bartery@ssjwyolaw.com
*Attorneys for Petitioners Basin Electric Power
Cooperative and Western Fuels Wyoming, Inc.*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| CLOUD PEAK ENERGY, INC., *et al.*, | ) | |
| | ) | |
| Petitioners, | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| THE INTERIOR, *et al.*, | ) | Case No. 19-cv-120-SWS |
| | ) | [and Related Case Nos. 19-cv- |
| Respondents. | ) | 121-SWS and 19-cv-126-SWS] |

## PETITIONERS' JOINT REPLY BRIEF

## <u>TABLE OF CONTENTS</u>

Introduction ..............................................................................................1

  A.  The 2016 Rule Is Not Merely a Bad "Policy Choice." ................................3

  B.  The Rule Is Devoid of Record Support. ......................................7

  C.  The Court Should Vacate the Rule's Disallowance of Bulk Oil and Gas
      Deepwater Transportation Costs. ..............................................11

  D.  The Court Should Vacate the Rule's Disallowance of Reasonable,
      Actual Costs to Transport and Process Federal Oil and Gas. ...................18

  E.  The Rule Arbitrarily Inflates Federal Gas Index-Based Valuation. ...........20

  F.  The Rule's Valuation of Coal Based on Electricity Sales, and
      Treatment of Coal Cooperatives, Are Unlawful and Unsupported. ..........22

      1.  Valuation of Coal Based on Electricity Sales Contradicts the
          Mineral Leasing Act, Longstanding Statutory Interpretations,
          and the Record ..............................................................23

      2.  There Is No Dispute that a Netback from Electricity Sales Is
          Functionally Impossible. ..................................................25

      3.  The Rule Arbitrarily Applies Geothermal Allowances to Coal .....26

      4.  Valuation of Coal Based on Electricity Sales Violates Due
          Process .......................................................................26

      5.  The "Coal Cooperative" Definition Is Arbitrary and
          Capricious ...................................................................27

  G.  The Rule's Forcing of Netbacks from Distant Coal Sales Is Arbitrary
      and Capricious ..................................................................29

  H.  The Rule's "Default Provisions" and Unbounded Triggers for ONRR
      Unilateral Valuation Are Arbitrary and Capricious ................................33

  I.  Remedy ..........................................................................37

Conclusion ...........................................................................40

## TABLE OF AUTHORITIES

**Cases**                                                                                   **Page(s)**

*Amoco Prod. Co. v. Watson,*
  410 F.3d 722 (D.C. Cir. 2005) ...........................................................................32

*Ass'n of Mfrs. v. U.S. Dep't of the Interior,*
  134 F.3d 1095 (D.C. Cir. 1998)......................................................................8, 9

*Baude v. United States,*
  955 F.3d 1290 (Fed. Cir. 2020) ........................................................................34

*Chevron, U.S.A., Inc. v. NRDC, Inc.,*
  467 U.S. 837 (1984) ................................................................................... 23, 24

*Cloud Peak Energy, Inc. v. U.S. Dep't of the Interior,*
  415 F. Supp. 3d 1034 (D. Wyo. 2019) .................................................... 9, 25, 38

*Connolly v. Gen. Const. Co.,*
  269 U.S. 385 (1926) ..........................................................................................28

*Encino Motorcars LLC v. Navarro,*
  136 S. Ct. 2117 (2016) ......................................................................................16

*FCC v. Fox TV Stations, Inc.,*
  556 U.S. 502 (2009) ..........................................................................................33

*FCC v. Fox TV Stations, Inc.,*
  567 U.S. 239 (2012) ..........................................................................................27

*Forest Guardians v. U.S. Forest Serv.,*
  641 F.3d 423 (10th Cir. 2011).............................................................................8

*Gerson v. Anderson-Prichard Prod. Corp.,*
  149 F.2d 444 (10th Cir. 1945).........................................................................14

*High Country Conservation Advocates v. U.S. Forest Service,*
  951 F.3d 1217 (10th Cir. 2020)........................................................................37

*HollyFrontier Cheyenne Ref., LLC v. Renewable Fuels Ass'n*,
    141 S. Ct. 974 (2021) ............................................................................4

*In re FCC 11-161*,
    753 F.3d 1015 (2014) ................................................................... 17, 18

*Kretni Development Co. v. Consolidation Oil Corp.*,
    74 F.2d 497 (10th Cir. 1934) ..............................................................14

*Like in Encino Motorcars, LLC v. Navarro*,
    136 S. Ct. 2117 (2016) .......................................................................16

*Marathon Oil Co. v. Andrus*,
    452 F. Supp. 548 (D. Wyo. 1978) ......................................................17

*Marinello v. United States*,
    138 S. Ct. 1101 (2018) .......................................................................36

*MCI Telecommunications Corp. v. Am. Tel. & Tel. Co.*,
    512 U.S. 218 (1994) ...........................................................................21

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) .........................................................................5, 31

*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Engineers*,
    417 F.3d 1272 (D.C. Cir. 2005)..........................................................36

*New Mexico ex rel. Richardson v. BLM*,
    565 F.3d 683 (10th Cir. 2009)............................................................15

*New Mexico v. U.S. Dep't of Interior*,
    854 F.3d 1207 (10th Cir. 2017)..........................................................21

*NRDC v. EPA*,
    489 F.3d 1250 (D.C. Cir. 2007)..........................................................38

*Olenhouse v. Commodity Credit Corp.*,
    42 F.3d 1560 (10th Cir. 1994)....................................... 7, 15, 31, 32

*Phillips Petroleum Co. v. Lujan*,
    760 F. Supp. 882 (N.D. Okla. 1989) .................................................36

*Renewable Fuels Ass'n v. U.S. Env't Prot. Agency*,
    948 F.3d 1206 (10th Cir. 2020) ...........................................................4

*S. Utah Wilderness All. v. Burke*,
    908 F.3d 630 (10th Cir. 2018) .............................................................36

*State of California v. U.S. Dep't of the Interior*,
    No. 17-5948, 2020 WL 1496278 (N.D. Cal. Mar. 16, 2020)..............................7

*United Techs. Corp. v. U.S. Dep't of Def.*,
    601 F.3d 557 (D.C. Cir. 2010)..............................................................7

*Univ. of Texas v. Camenisch*,
    451 U.S. 390 (1981) .........................................................................9

*Western Fuels-Utah, Inc.*,
    130 IBLA 18 (1994) .........................................................................24

*Wyoming v. U.S. Dep't of the Interior*,
    493 F. Supp. 3d 1046 (D. Wyo. 2020) ................................... 4, 13, 17, 33, 37, 38

## Statutory Authorities

5 U.S.C. § 706 .....................................................................................32
5 U.S.C. § 706(2)(E) ...........................................................................7
30 U.S.C. § 207(a).................................................................. 23, 32, 40
30 U.S.C. § 1702(14) ..........................................................................20
30 U.S.C. § 1713 .................................................................................34

## Rules and Regulations

30 C.F.R. § 1206.20 ........................................................... 11, 18, 28, 34
30 C.F.R. §§ 1206.102(c)(2)(ii)(A) & (B) (2015) ................................35
30 C.F.R. § 1206.109(a).......................................................................36
30 C.F.R. § 1206.110(a)(1)(ii) .............................................................40
30 C.F.R. § 1206.110(a)(2)(ii) ........................................................ 11, 18

30 C.F.R. §§ 1206.110(d)(1) & (2) .................................................. 19, 40
30 C.F.R. §§ 1206.144(a)-(c) ......................................................... 31, 36
30 C.F.R. § 1206.149(a) ....................................................................36
30 C.F.R. § 1206.152(a)(2)(ii) ............................................... 11, 18, 40
30 C.F.R. § 1206.251 (2015) .............................................................31
30 C.F.R. §§ 1206.252(b)(1) & (e) .....................................................39
30 C.F.R. §§ 1206.252(e)(1) & (2) ............................................... 19, 40
30 C.F.R. § 1206.254(a) ....................................................................31
30 C.F.R. § 1206.259(a) ....................................................................36
30 C.F.R. §§ 1206.259(c)(2), (3), & (4) ....................................... 19, 40
30 C.F.R. §§ 1206.452(1) & (e) .........................................................39

52 Fed. Reg. 4,732 (Feb. 13, 1987) ............................................. 10, 11
53 Fed. Reg. 1,184 (Jan. 15, 1988) .............................................. 13, 30
53 Fed. Reg. 1,230 (Jan. 15, 1988) ...................................................11
54 Fed. Reg. 1,492 (Jan. 13, 1989) ...................................................29
86 Fed. Reg. 4,612 (Jan. 15, 2021) .....................................................6
86 Fed. Reg. 20,032 (Apr. 16, 2021) ...................................................9

Fed. R. Civ. P. 25(c) .........................................................................23

## Additional Authorities

*Bureau of Safety and Environmental Enforcement Glossary,*
    https://www.bsee.gov/newsroom/library/glossary#:~:text=Blocks%20are
    %20portions%20of%20OCS,square%20miles%20or%202%2C304%20he
    ctares. ........................................................................................14

*Federal Advisory Committee Act Database*
    https://www.facadatabase.gov/FACA/apex/FACAPublicCommittee?id=a
    10t0000001gzovAAA................................................................................10

John S. Lowe, *Oil and Gas Law in a Nutshell,* (6th ed. 2014)................14

Maurice H. Merrill, *The Law Relating to Covenants Implied in Oil and Gas Leases,*
    (2d ed. 1940).........................................................................................15

# INTRODUCTION

Federal Respondents and Respondent-Intervenors (collectively, "Respondents") attempt to globally defend the challenged 2016 Rule's myriad deficiencies by characterizing them as mere "policy choices."  Moreover, Respondents argue that the Rule is immune to these deficiencies because the Office of Natural Resources Revenue ("ONRR") summarily dismissed them during its rulemaking process.  Respondents further ignore that ONRR belatedly and repeatedly acknowledged these deficiencies.  Respondents also repeatedly treat these deficiencies as finally decided by the Court's preliminary injunction opinion, despite the Court expressly stating the opposite.  Those responses are all unavailing.

Respondents again fail to meaningfully address, let alone rebut, Petitioners' legal and factual arguments for vacatur of the 2016 Rule as arbitrary and capricious and *ultra vires*.  Indeed, their briefs confirm the Rule's dearth of administrative record support beyond parroting conclusory preamble statements and Intervenors' own unsubstantiated and self-serving "concerns"—far from the substantial evidence required to sustain the Rule.  Nor do they square the Rule's unexplained inconsistency both internally and with longstanding agency practice.

For example, Respondents invoke dual fictions to justify the Rule's sudden, blanket disapproval of transportation allowances for bulk subsea movement of

1

federal oil and gas on the deepwater Outer Continental Shelf ("OCS"): (i) that

ONRR's prior position improperly authorized deductions for gathering, and

(ii) that it was not necessary to continue the prior policy because the policy had

achieved its purposes by promoting deep water development. Respondents also

fail to harmonize the Rule's hard caps on federal oil and gas transportation and

processing allowances with the Rule's provisions for deductions of verified

reasonable, actual such costs or with ONRR's rejection of such caps for

corresponding federal and Indian coal and Indian oil valuation regulations.

Respondents concede that the Rule artificially inflates the royalty value of federal

gas based on alleged administrative convenience of using an index price for

valuation, but identify no legal basis for ONRR to demand royalty on that

artificially inflated value.

Federal Respondents now concede that the 2016 Rule's provisions valuing

coal based on sales of electricity, and singling out coal cooperatives, cannot stand.

As Petitioners have explained, the 2016 Rule's other federal and Indian coal

valuation provisions are equally arbitrary, inconsistent, and unworkable, including

because they uniquely force coal lessees to employ netback methods for valuing

coal that ONRR recognizes are least reliable. Respondents ignore the Rule's

default provisions' substantial changes to existing oil, gas, and coal valuation

regulations, and thus fail to satisfy even the first step to justify them. Similarly,

Respondents nowhere rationalize the universal written signature requirement or other numerous triggers for ONRR to undertake this extreme step of unilaterally second-guessing lessee valuations.

To be clear, the 2016 Rule's flaws are so fundamental and pervasive as to warrant the Rule's total vacatur. The Court should not (via Federal Respondents' contrived "Motion for Final Judgment" or otherwise) embark on a line-item judicial rewrite of the 2016 Rule. Rather, the Court should remand for ONRR to promulgate a new rule if the agency so desires, just as ONRR most recently did in January 2021, and is reevaluating today. If the Court considers a partial remedy, however, for coal at a minimum the Court should again enjoin and vacate the Rule's coal provisions given their interrelatedness and Federal Respondents' concession that the Rule's entire methodology for valuing certain coal is unlawful. For federal oil and gas, if the Court agrees the challenged provisions on transportation and processing allowances are invalid, the Court may readily sever them from Rule provisions more comprehensively specifying initial valuation methodologies for oil and gas before applying the relevant transportation and processing allowances. The federal gas index-based methodology's identified flaws are also severable.

## A.    The 2016 Rule Is Not Merely a Bad "Policy Choice."

As explained in Petitioners' Opening Brief, and below, the 2016 Rule's legal

deficiencies extend beyond "policy choices."  At the outset, however, there exists

no "policy choice" exception to judicial review of an agency rule.  That is, ONRR

has no "discretion" to avoid its duty to cogently explain its actions and ground

them in the factual record, especially where ONRR purports to abandon its prior

longstanding and stable system of royalty valuation.  *See* Petitioners' Opening

Brief at 32-35, ECF No. 89 ("POB").[1]  In particular, ONRR legally cannot invoke,

and then selectively disregard, the same policy.  Indeed, "'[u]nexplained

inconsistency' can be 'a reason for holding an interpretation to be an arbitrary and

capricious change from agency practice under the Administrative Procedure Act

['APA'].'"  *Wyoming v. U.S. Dep't of the Interior*, 493 F. Supp. 3d 1046, 1084 (D.

Wyo. 2020); *see also Renewable Fuels Ass'n v. U.S. Env't Prot. Agency*, 948 F.3d

1206, 1255 (10th Cir. 2020), *cert. granted sub nom. on other grounds*,

*HollyFrontier Cheyenne Ref., LLC v. Renewable Fuels Ass'n*, 141 S. Ct. 974

(2021).

    The 2016 Rule is rife with unsupported inconsistency.  The government's

brief repeats the Rule's stated purposes of "greater simplicity, certainty, clarity,

and consistency in production valuation."  Federal Respondents' Answering Brief

at 6, ECF No. 97 ("RAB").  But it nowhere explains how those purposes are

---

[1] As in Petitioners' Opening Brief, all ECF citations to this case are to the lead case docket (No. 19-120) and all pincites herein to ECF documents are to the page numbering of the documents themselves (i.e., in their footers).

fulfilled by the Rule's provisions which, e.g., freely enable ONRR's second-guessing of lessees' valuation and ability to demand additional royalties, render reporting more onerous for lessees, and force coal lessees to employ inherently unreliable netbacks.  Similarly, the government's brief does not dispute or purport to disturb bedrock principles of royalty valuation as detailed by Petitioners.  *E.g.*, RAB 7 (arguing the "Rule did not alter the underlying principles of the current regulations . . . .").[2]  But the Rule then does exactly that, such as ignoring the concept of valuation at the lease by denying lessees even the opportunity to claim certain transportation allowances based on substantiated incurred costs.  *See* POB 9-23.  Nor does the government explain why, if long-term royalty undervaluation were such a rampant concern, the Rule itself forecasts its new requirements will result in only relatively modest additional royalty collections, with *nothing* additional for coal.  *See* AR_73992; POB 67.  Thus, the Rule provides no "rational connection between the facts found and the choice made."  *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation marks omitted).

The government also cannot credibly urge deference to ONRR's "choices" in the Rule that ONRR itself has repeatedly disavowed.  To be sure, the coal

---

[2] Because the Rule purports to preserve the core royalty valuation principles explained by Respondents, the entire contrary premise of Intervenors' brief that "ONRR can alter them" is *post hoc* and irrelevant to this litigation.  *See* IOB 16.

valuation provisions that ONRR in this litigation now agrees are misguided were no less a choice in 2016 than the rest of the Rule.  Moreover, ONRR's inability to provide Rule implementation guidance when the Rule initially was adopted, and ONRR's most recent royalty valuation rulemaking removing many of the problematic provisions after the filing of Petitioners' Opening Brief, illuminate the Rule's many fatal flaws.  *See* POB 26-27; 86 Fed. Reg. 4,612 (Jan. 15, 2021) (final rule prospectively rescinding, *inter alia*, the uniform definition of deepwater bulk oil and gas movement as gathering, inflexible caps on oil and gas allowances, full signatures requirement for written contracts, netbacks from electricity sales for coal, coal cooperative definition, and "default provisions").  Thus, the Court should accord little, if any, weight to ONRR's so-called "policy choices" stated in the 2016 Rule as a basis to affirm that Rule.

Intervenors' "policy" arguments in turn merely reveal their own preferred aims and misunderstandings of royalty valuation.  That is unsurprising given that no Intervenor has ever reported or paid federal or Indian royalty, and the two Intervenor States produce little to no federal coal and derive a minimal proportion of total oil and gas royalties from federal lands.  Like the government, Intervenors recite the Rule's "stated purposes," but then simply accept that the Rule achieves them because the Rule says it does.  *See* Intervenors' Opposition Brief at 9, ECF No. 102 ("IOB").  And as the government points out, the Intervenor groups' chief

interests lay elsewhere—"urg[ing] ONRR to create disincentives to extraction to the point of ensuring commodities stay underground."  RAB 2.  Intervenors also apparently seek deference only for ONRR "policy" they like.  In fact, Intervenors argued for—and obtained—far greater scrutiny by the Northern District of California of ONRR's 2018 royalty valuation rule.[3]  Intervenors cannot have it both ways.

**B.      The Rule Is Devoid of Record Support.**

Even under Respondents' "policy choice" paradigm, the 2016 Rule fails because the administrative record does not support ONRR's decisions in the Rule. As Respondents admit, "substantial evidence" must exist to uphold the Rule.  *See Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1576, 1580-81 (10th Cir. 1994); 5 U.S.C. § 706(2)(E).  Within the Rule, ONRR must articulate a "rational connection between the facts found and the choice made."  *Id.* at 1576.  "Evidence is not substantial if it is overwhelmed by other evidence . . . or if it constitutes mere

---

[3] *Compare* IOB 14-16, *with State of California v. U.S. Dep't of the Interior*, No. 17-5948, ECF No. 47 at 8-10 (States' summary judgment motion, arguing *inter alia* that "any 'unexplained inconsistency'" for a policy change may render it arbitrary and capricious) (citation omitted), *and* ECF No. 48 at 7, 14 (groups' summary judgment motion, arguing *inter alia* for same and a "more detailed justification" than for prior agency policy) (citation omitted).  What is more, upon obtaining vacatur of ONRR's 2018 valuation rule, Intervenors—unsuccessfully—pursued a "motion to enforce" in the Northern District of California to compel ONRR to implement the reinstated 2016 Rule as Intervenors deemed best.  *See State of California,* No. 17-5948, 2020 WL 1496278 (N.D. Cal. Mar. 16, 2020) (Magistrate Judge opinion), *aff'd, id.* ECF No. 96.

conclusion." *Id.* at 1581; *see also United Techs. Corp. v. U.S. Dep't of Def.*, 601 F.3d 557, 562 (D.C. Cir. 2010) ("[W]e do not defer to the agency's conclusory or unsupported suppositions."). Nearly all of the record, and Respondents' defense of the Rule, constitutes mere conclusion that is not entitled to deference.

Respondents dedicate much of their briefs to re-quoting the Rule's preamble setting forth ONRR's conclusions and findings. Tellingly, however, they fail to cite evidence in the preamble or record to support those statements, other than Intervenors' own submitted rulemaking comments which equally lack support. Respondents also offer no reply to Petitioners' refutation of ONRR's citations in the Rule's preamble, such as for the Rule's arbitrary prohibition of deepwater transportation allowances. *See* POB 42-44.

Respondents make much of the parallel between Petitioners' arguments in this litigation and their prior comments to ONRR during the rulemaking process for the 2016 Rule. That linkage is unremarkable; indeed, it is required to exhaust administrative remedies prior to judicial review. *See, e.g.*, *Forest Guardians v. U.S. Forest Serv.*, 641 F.3d 423, 430-31 (10th Cir. 2011) ("Plaintiffs must exhaust available administrative remedies before the USFS prior to bringing their grievances to federal court."); *Ass'n of Mfrs. v. U.S. Dep't of the Interior*, 134 F.3d 1095, 1111 (D.C. Cir. 1998) (failure to raise argument in rulemaking proceedings constitutes failure to exhaust administrative remedies). Moreover, ONRR's

rejection of these arguments when promulgating the 2016 Rule does not render them unmeritorious or irrelevant.  In other words, ONRR cannot insulate its Rule from challenge simply by rejecting comments during the rulemaking; were it otherwise, judicial review of agency regulations would serve no meaningful function.  By analogy, after rejecting various received comments in its most recent 2021 valuation rule, ONRR credited those same rehashed comments, including "public comments suggesting the potential for litigation," as "good cause" to delay the effectiveness of that rule by several months and open a new public comment period.  86 Fed. Reg. 20,032, 20,034 (Apr. 16, 2021).

Additionally, Respondents repetitively quote the Court's preliminary injunction ruling as dispositive on the merits of the Petitions in these cases.  But this Court plainly stated otherwise.  Due to the inherently different standards for a *preliminary* injunction and final judgment, "it is generally inappropriate for a federal court at the preliminary-injunction stage to give a final judgment on the merits."  *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).  Accordingly, this Court specified that its preliminary findings and conclusions "do not constitute a determination on the merits, but are preliminary findings in the context of the limited evidence presented at the hearing for a preliminary injunction."  *Cloud Peak Energy, Inc., et al. v. U.S. Dep't of the Interior*, 415 F. Supp. 3d 1034, 1053 (D. Wyo. 2019) (quotation marks and citation omitted).  Intervenors elsewhere

9

admit as much.  IOB 37 (Court's preliminary injunction ruling was "made in the absence of the administrative record and was not a decision on the merits").

Respondents also tout ONRR's "five-year rulemaking process."  *E.g.,* IOB 19.  But they cite no authority directly correlating a rulemaking's duration and its merits.  Moreover, as Petitioners have pointed out, the record demonstrates that ONRR did not actively work on the Rule during that entire period.  POB 30-31.

The only other record document cited by Respondents is a 2007 report by the Royalty Policy Committee issued nearly a decade before the 2016 Rule, and already addressed by Petitioners and the Court.  *See* POB 25-26; AR_3.  That Committee, which has since been disbanded,[4] did not recommend the Rule's significant regulatory reversals and new requirements challenged in this litigation. In fact, that Committee's predecessor, the Royalty Management Advisory Committee, supported the establishment of the agency's preexisting royalty valuation regulations that stood for nearly two decades.  *See, e.g.*, 52 Fed. Reg. 4,732 (Feb. 13, 1987) (proposed rule for gas).  Those regulatory reforms were intended to "allow[] the lessee certainty in determining its own value without dependence upon MMS to establish the value," and thereby avoid large audit bills for additional royalties and substantial late payment interest months or years after

---

[4] *See Federal Advisory Committee Act Database*,
https://www.facadatabase.gov/FACA/apex/FACAPublicCommittee?id=a10t00000
01gzovAAA.

the production occurred.  *Id.* at 4,735; *see also* 53 Fed. Reg. 1,230, 1,248 (Jan. 15,

1988) (same in final rule for gas).  By contrast, the 2016 Rule undoes those

reforms and reinstates prevalent uncertainty.  The record fails to justify this result.

**C.     The Court Should Vacate the Rule's Disallowance of Bulk Oil and Gas
         Deepwater Transportation Costs.**

As Petitioners have shown, the Rule's rewrite of 30 C.F.R. §§ 1206.20,

1206.152(a)(2)(ii), and 1206.110(a)(2)(ii) to undo a nearly 20-year stated agency

position and totally reclassify all deepwater movement of bulk federal oil and gas

as non-deductible "gathering" is arbitrary and capricious.  POB 35-45.  The

government concedes there is no new or changed factual evidence for this

significant reversal.  RAB 27-28.  Nor do Respondents defend the Rule preamble's

miscited, sparse authorities for this result.  *See* POB 42-44 (refuting, e.g., *Kerr-

McGee* and *California Co. v. Udall*).  The government points to "the complexity of

the inquiry, the record, and ONRR's analysis," but in reality identifies nothing in

the record beyond ONRR's conclusory *ipse dixit* in the Rule's preamble and

Intervenors' misguided opinions aggrandizing lessee "obligations."  *See* RAB 28.

Respondents aver that ONRR's "Deep Water Policy" pre-dating the 2016

Rule was an "exception" to the non-deductibility of gathering costs in valuing

federal oil and gas, and defend its reversal on that basis.  RAB 30; IOB 23.  That

premise is false.  To be clear, Petitioners *never* have claimed that gathering costs

are deductible.[5]  The Deep Water Policy made no such claim either.  Indeed,

Respondents fail to grapple with the *actual terms* of the Deep Water Policy, which

expressly specified that "[t]o qualify for a transportation allowance, the movement

must be to a facility that is not located on a lease adjacent to the lease on which the

production originates."  AR_1.  In doing so, it foreclosed allowances in

determining the royalty value of oil or gas moved within a deepwater lease or to

any of the eight surrounding leases "with at least one point of contact with the

producing lease/unit."  *Id.*  The Deep Water Policy recognized that such

"[m]ovement prior to a central accumulation point is considered gathering."  *Id.*[6]

---

[5] Intervenors misrepresent Petitioner API's submitted comments on the proposed 2016 Rule as somehow conceding the Deep Water Policy allowed deduction of gathering costs.  *See* IOB 25.  In reality, API's comment letter plainly states that "moving offshore oil or gas over many miles is transportation, not gathering." AR_1457.  Because the Deep Water Policy did not license deductions of gathering costs, it did not "conflict" with ONRR's prior regulations.  *See* IOB 25.

[6] In a footnote, Federal Respondents rely on the preamble to the 1988 gas valuation regulations to support that lessees always have been obligated to incur all costs prior to the point of treating the production or accumulating production for delivery to a purchaser.  RAB 27 n.4.  However, Respondents acknowledge that the 1988 regulations only "*generally* prohibited companies from taking a transportation allowance for any costs incurred before the oil and gas is conditioned and measured for royalty purposes" (emphasis added).  More importantly, in 1988 the technology for deepwater production did not exist.  Thus, the agency at the time had no opportunity to consider that instead of treatment and accumulation occurring nearly always in relative proximity to where production occurred, new deepwater production technology would be developed years later to move production as far as 50 miles from a subsea manifold to the first deep water facility for treatment and accumulation, a distance that previously always was considered transportation and not gathering.

Thus, it was the Deep Water Policy, and not the 2016 Rule, that was faithful to preexisting regulations and longstanding legal principles of royalty valuation. The Deep Water Policy provided this clarification for two decades, and it was issued contemporaneously with the new technological advances supporting expanded deepwater OCS development—hardly "temporary" as Intervenors allege. *See* IOB 25-26.

The main fallacy in the Rule's redefinition of "gathering" is that it simply presumes, without support, that *no* subsea movement of bulk oil and gas on the deepwater OCS is transportation.  Respondents cite no precedent supporting the notion that movement of oil and gas as far as 50 miles towards available markets is non-deductible gathering.  That lack of support for Respondent's position is unsurprising given the core principle, which the Rule nominally purports to retain, that royalty is owed on the value of production at or near the lease, and not significantly downstream from the lease without a proper allowance for transportation costs.[7]  POB 9-16; AR_80002; *see also* 53 Fed. Reg. 1,184, 1,186

---

[7] Because the 2016 Rule accepts the key tenet of royalty valuation at or near the lease, Intervenors' (erroneous) alternative suggestions that deductions are legally optional again merit no response and cannot sustain the Rule.  *See* IOB 58.  The same is true for Intervenors' straw men assertions regarding whether federal oil and gas lessees are "entitled to a certain level of profit."  *See* IOB 26.  In any event, it is blackletter law that mineral leases are contracts for the mutual benefit of lessor and lessee.  *See, e.g., Wyoming*, 493 F. Supp. 3d at 1072 ("Oil and gas leases—including those between the federal government and its lessees—are intended to

(Jan. 15, 1988) (prior oil valuation final rule stating that "[ONRR] believes that costs incurred by a lessee to transport lease production to a delivery point off the lease increases its value and, therefore, is a recognized deduction.").

As Petitioners have explained, that principle applies with particular force when coupled with the realities of the offshore environment, including lease blocks' sheer size (about 9 square miles each)[8] and paucity of surface platforms on the deepwater OCS. *See* POB 39-40. These circumstances, which contrast starkly with the circumstances common in onshore oil and gas producing fields or even on the shallow water OCS, remove such long-distance subsea movement from concerns animating classification of gathering as a non-deductible expense to attain marketable condition. *Cf. Kretni Development Co. v. Consolidation Oil Corp.*, 74 F.2d 497, 500 (10th Cir. 1934) ("It may be conceded for the purpose of this case that a lessee is obligated to put forward a reasonable effort to market gas

---

ensure *mutually profitable* development of the lease's mineral resources . . . . Congress enacted the [Mineral Leasing Act] against this backdrop of consideration for operator economics.") (emphasis in original, citations omitted); *Gerson v. Anderson-Prichard Prod. Corp.*, 149 F.2d 444, 446 (10th Cir. 1945) ("the purpose of the [oil and gas lease] contract is the mutual benefit of the lessor and lessee"); John S. Lowe, *Oil and Gas Law in a Nutshell*, 212 (6th ed. 2014) (the fact that the oil and gas lease remains in effect as long as the lease produces "in paying quantities" demonstrates that the lease is an "economic transaction" based on mutual economic benefit).

[8] Bureau of Safety and Environmental Enforcement Glossary (defining "Block")*, https://www.bsee.gov/newsroom/library/glossary#:~:text=Blocks%20are%20porti ons%20of%20OCS,square%20miles%20or%202%2C304%20hectares.*

produced on the leased premises, but certainly that duty does not extend to the point of providing pipe line facilities ninety miles in length at a large outlay of money with an extending financial hazard due to possible exhaustion of the supply and other frequently encountered factors, in order to reach a market at which the product may be sold."); Maurice H. Merrill, *The Law Relating to Covenants Implied in Oil and Gas Leases, at* 219 (2d ed. 1940) ("[t]he transportation to the distant point is no part of the legitimate operating expense of the lease").

It is not enough for ONRR to say it received public comments with multiple views on the deductibility of deepwater bulk movement, and chose one.  As the Tenth Circuit has made clear, "the grounds upon which the agency acted must be clearly disclosed in, and sustained by, the record. . . . The agency must make plain its course of inquiry, its analysis and its reasoning. . . . After-the-fact rationalization by counsel in briefs or argument will not cure noncompliance by the agency with these principles."  *Olenhouse*, 42 F.3d at 1575.  By instead disregarding the unique context for long-distance deepwater movement of production, ONRR's Rule both "entirely failed to consider an important aspect of the problem" and "failed to base its decision on consideration of the relevant factors."  *New Mexico ex rel. Richardson v. BLM*, 565 F.3d 683, 704 (10th Cir. 2009).

Similarly baseless is the Rule's purported justification that the Deep Water

Policy "had served its historical purpose."  RAB 30.  The record contains no

support for this claim.  Respondents fail to recognize that the *very same* operators

that made multi-hundreds of millions of dollars in investments in OCS deep water

development, in reliance on the Deep Water Policy's clarification and future

opportunity to demonstrate transportation costs, still need those allowances for

current production, and for years to come, to recoup those prior investments.  *See*

POB 39-40.  The government accuses Petitioners of "conclusory, generalized

assertions" of reliance, but does not dispute that the Deep Water Policy (consistent

with other government actions) specifically elicited such reliance to expand deep

water development under contractual lease agreements—or that the Rule itself

offers nothing more than such bald assertions for its sea change.  *See* RAB 26

(claiming ONRR had "effected its purpose of encouraging deep water leasing").

Like in *Encino Motorcars, LLC v. Navarro*, "the Department said almost nothing"

beyond "conclusory statements" to warrant a "regulation that is inconsistent with

the Department's longstanding earlier position"—and substantiated even less.  *See*

136 S. Ct. 2117, 2127 (2016).

Respondents also retort that Petitioners have no legitimate reliance interest

in regulations being static.  That is a straw man.  Petitioners are not arguing that

ONRR lacks discretion to properly amend its royalty valuation regulations if such

amendments are consistent with basic principles of royalty valuation and supported

by the administrative record. Rather, ONRR is not free to announce an interpretation on deepwater transportation admittedly to actively induce construction of offshore oil and gas infrastructure (e.g., subsea manifolds, pipelines, and shared platforms) by deepwater lessees, and to then summarily reverse itself for the same ongoing production after inducing precisely its desired reaction from lessees to its prior announcement. *See Marathon Oil Co. v. Andrus,* 452 F. Supp. 548, 549 (D. Wyo. 1978) ("This Court cannot lose sight of the general rule that, when the executive department charged with the execution of a statute gives a construction to it and acts upon that construction for many years, the Court looks with disfavor upon a change whereby parties who have contracted in good faith under the old construction may be injured by a different interpretation."); *Wyoming*, 493 F. Supp. 3d at 1074 ("courts are skeptical when an agency adopts a novel interpretation that conflicts with an earlier, contemporaneous interpretation that was applied consistently for decades"). That is akin to Lucy baiting Charlie Brown to kick the football and then snatching it away at the last moment as he tries to make the kick, landing him flat on his back.

None of Respondents' cited cases supports their position. For example, in Intervenors' chief cited case, the Federal Communications Commission ("FCC") found that certain allowed cost recovery for rural utility lines was *not* resulting in "significant increases in investment, which is contrary to the intent of the [prior]

17

rule"—the opposite of ONRR's conclusion on the Deep Water Policy. *In re FCC 11-161*, 753 F.3d 1015, 1071 (2014). And even in that circumstance, contrary to the 2016 Rule's elimination of all subsea transportation allowances on the deepwater OCS, the FCC "phase[d] out the [prior allowance] over time" and created a new "benchmarking" system to evaluate such costs going forward. *Id.* at 1071-72. The Tenth Circuit also recognized that "[a] rule that has unreasonable secondary retroactivity . . . may for that reason be 'arbitrary' or 'capricious' and thus invalid." *Id.* at 1072 (citation omitted). Unlike ONRR's bald reversal, the FCC explained its action "in detail." *See id.* at 1072-73.

Thus, the Rule and record fail to support that all deepwater bulk movement is "gathering" or that transportation deductions for such costs are now obsolete. As such, the Rule's stated reasons for disallowing all deepwater bulk oil and gas transportation costs are baseless. Consequently, the Rule's vast expansion of gathering in §§ 1206.20, 1206.152(a)(2)(ii), and 1206.110(a)(2)(ii) should be vacated.

**D. The Court Should Vacate the Rule's Disallowance of Reasonable, Actual Costs to Transport and Process Federal Oil and Gas.**

Like the Rule, the government's brief does not dispute that a basic tenet of federal royalty valuation is that valuation must occur at or near the lease, and not at some point downstream from the lease without an allowance for the costs of enhancing the production's value by moving it nearer to a market. *See* POB 13-16.

Indeed, §§ 1206.110(a), 1206.152(a), and 1206.159(a) of the Rule expressly allow

for "reasonable, *actual*" costs of transporting and processing federal oil and gas

(emphasis added).  Yet, as Petitioners demonstrated, the Rule cannot uphold these

principles while at the same time arbitrarily and unconditionally capping such

allowances, thereby inflating royalties owed.  *See* POB 45-50.  If the lessee does

not receive an allowance for the full amount of its reasonable, actual costs to

transport its production, it is ineluctable that royalty value is improperly inflated.

Respondents cannot defend this double standard.  The government's brief

simply asserts "considerable discretion" and claims ONRR landed "somewhere

between" Petitioners' arguments and the unsubstantiated views of "other

commenters"—like Intervenors—that do not report and pay royalties.  RAB 32-33.

This opaqueness warrants no deference from the Court.

Moreover, Respondents fail to square the unexplained inconsistency created

by the Rule.  First, the government concedes the Rule *rejected* inflexible caps for

federal and Indian coal allowances, with no justification for treating federal oil and

gas differently.  *See* RAB 48 ("To coal Petitioners' benefit, ONRR concluded 'we

will not impose a cap on transportation allowances at this time. We consider the

reasonable, actual cost of transporting coal to be the best method for establishing

an appropriate allowance when determining coal royalty value and will continue to

implement this regulation.'").  Second, the Rule contravenes ONRR's

contemporaneous *rejection* of such fixed allowance caps for Indian oil valuation.
*See* POB 48-49.  Third, Respondents do not deny that a lessee *may* necessarily
incur actual costs exceeding the caps, but nowhere explains why such costs are not
deductible as reasonable, actual costs under the Rule.  Finally, Respondents fail to
reconcile why *already proven and approved* allowances for such costs are
suddenly part of non-deductible marketable condition costs, and instead just
facilely asserts that this change applies going forward.  *See* RAB 32.

Accordingly, the Rule's §§ 1206.110(d)(1) & (2), 1206.152(e)(1) & (2), and
1206.159(c)(2), (3), & (4) should be vacated.

## E.     The Rule Arbitrarily Inflates Federal Gas Index-Based Valuation.

Respondents do not rebut that the Rule adds a premium to the index-based
valuation of federal gas, and that this premium is based solely on the perceived
greater administrative convenience of index valuation compared to a lessee chasing
gross proceeds to the first arm's-length sale point and then calculating applicable
allowances back to the lease.  *See* POB 50-54.  The government avers "[o]f course,
that is not what the Rule would do."  RAB 34.  But its brief then concedes the
point: "ONRR required the 'highest index price at a pricing point' because the
index method allowed lessees to avoid the administrative burdens and expenses of
more complicated valuation methods."  RAB 35.

The Mineral Leasing Act and the Outer Continental Shelf Lands Act

authorize ONRR to assess royalty only on the market value of oil or gas. *See* POB

9-16; *see also* 30 U.S.C. § 1702(14) (Federal Oil and Gas Royalty Management

Act defining "royalty" as "any payment based on the *value or volume of*

*production* which is due to the United States or an Indian tribe or an Indian allottee

on production of oil or gas from the Outer Continental Shelf, Federal, or Indian

lands . . ." (emphasis added)). Respondents identify no statutory authority for

ONRR to obtain additional revenue for the Treasury based on an upcharge for the

purported convenience of the methodology used to value the production. This

legal shortcoming is fatal to the Rule and alone warrants vacatur. *See MCI*

*Telecommunications Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 231 n.4 (1994)

(agencies are "bound, not only by the ultimate purposes Congress has selected, but

by the means it has deemed appropriate, and prescribed, for the pursuit of those

purposes"); *New Mexico v. Dep't of Interior*, 854 F.3d 1207, 1224 (10th Cir. 2017)

("Regardless of how serious the problem an administrative agency seeks to

address . . . it may not exercise its authority in a manner that is inconsistent with

the administrative structure that Congress enacted into law.") (quotations and

citations omitted) (overturning Department of the Interior regulations on Indian

gaming compacts).

      Respondents' other attempted justifications are unavailing as well. ONRR's

consideration of "six major geographic areas" is a *non sequitur* unrelated to its

"choice" to insist on the *highest* reported monthly bidweek price, and to disregard the actually attainable flows and sales of gas.  *See* RAB 35.  It also is an unavailing answer to Petitioners' arguments to call index valuation an "option" that lessees may decline, particularly given ONRR's recognition of the difficulties of the alternative of chasing gross proceeds which supports an index methodology in the first place.  *See* RAB 34.  Nor does the record substantiate any "expressed concern about abuse of the index pricing method."  *See* RAB 35.  Respondents likewise cannot identify any record evidence to support the Rule's provisions for arbitrary location differentials resulting in further inflation of index prices.  *See* POB 52-54.

Petitioners do not quarrel with the use of an index-based valuation methodology.  The issue is not whether ONRR generally may adopt index-based prices for royalty valuation.  However, any such prescribed methodology must be legal and factually supported.  The Rule is neither, and thus should be vacated.

## F.    The Rule's Valuation of Coal Based on Electricity Sales, and Treatment of Coal Cooperatives, Are Unlawful and Unsupported.

Federal Respondents do not defend the Rule's provisions using electricity sales to value coal, or the Rule's definition of coal cooperatives, and agree they should be vacated.  Intervenors' unilateral attempt to offer a defense of these Rule provisions fails because they cannot point to any support in the law or the administrative record for these provisions.  Nor do they have any answer to the Rule's own estimate that its changes will result in zero, or even negative, effects on

royalty collection from federal and Indian coal production.[9]  AR_73992.

1.    *Valuation of Coal Based on Electricity Sales Contradicts the Mineral Leasing Act, Longstanding Statutory Interpretations, and the Record.*

The Mineral Leasing Act, 30 U.S.C. § 207(a), and the regulations and cases interpreting it, consistently have looked to the value of the lease product—coal—to determine value for royalty purposes.  *See* POB 60-62.  Although the regulations in effect before the 2016 Rule included, as a method of last resort, a netback methodology to determine value for royalty purposes, that calculation always started with sales of the lease product at the first market where the value of that lease product could be determined, not sales of something that was created using the lease product as an input.  *See* POB 61-62.  Intervenors offer no legal authority to the contrary.  Their citations to *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984), and *Western Fuels-Utah, Inc.*, 130 IBLA 18 (1994), are unhelpful to

---

[9] Federal Respondents' passing footnote suggestion of "standing considerations" based on "which entities are asserting each of the coal related challenges" is unfounded.  RAB 39 n.5.  Notably, no Respondent actually argues Petitioners' standing in these consolidated cases.  In any event, Petitioners' Opening Brief, Petitions, and filed declarations in these cases plainly state their interests.  For example, Petitioners National Mining Association and Wyoming Mining Association represent member companies operating coal leases on federal and Indian lands affected by the Rule's various coal-related provisions.  *See* POB 6-7.  Petitioners Tri-State Generation and Transmission Ass'n, Inc., Basin Electric, and Western Fuels-Wyoming are either lessees of record or operators of federal coal leases.  *See* ECF No. 1 in 2019-cv-00126-SWS.  Moreover, Cloud Peak Energy's transfer of its lease interests to the Navajo Transitional Energy Company, LLC is irrelevant.  *See* Fed. R. Civ. P. 25(c).

their argument.  *Chevron* provides for deference to an agency interpretation only when Congress has not spoken.  "If the intent of Congress is clear, that is the end of the matter."  467 U.S. at 842-43.  Here, Congress spoke in the Mineral Leasing Act and stated that royalty is owed on the value of "coal."  In *Western Fuels-Utah*, the factors listed for the agency to consider in determining reasonable value of coal are tied to coal sales, not sales of products where coal is an input.  130 IBLA at 24-25.  In sum, Intervenors cite no legal authority for valuing coal based on electricity sales.

Moreover, nothing in the administrative record acknowledges, let alone explains, such a substantial departure by the agency from the Mineral Leasing Act and the regulations and cases interpreting it.  Intervenors' citations to the administrative record are to copies of the Rule or the preamble for the Federal Register notice of the Rule (*see* AR_73963 to 74028), or to public comments (largely their own) that may state a "concern" about pre-2016 Rule valuation methods but do not address use of electricity sales as a valuation method (AR_74682-83, AR_293-94, AR_1481-1602).  Notably, Intervenors do not cite to any evidence in the administrative record that correlates the value of coal with the sale of electricity.  The lack of record support further demonstrates that the Rule's use of electricity to value coal is arbitrary and capricious and should be set aside.

2.    *There Is No Dispute that a Netback from Electricity Sales Is
      Functionally Impossible.*

At the preliminary injunction hearing on September 4, 2019, all Respondents

were unable to describe how to perform a netback calculation from electricity sales

to value coal.  The Court recognized the inherent problem with the Rule's netback

provision in its preliminary injunction decision that "[t]rying to value coal based

on the sale of electricity is akin to valuing wheat based on the sale of a cake; there

may be a relationship between the two, but it is weak and several other factors play

a much larger role in determining the sales price of the end product."  *Cloud Peak*,

415 F. Supp. 3d at 1051.  Federal Respondents have now conceded that such a

netback would be unworkable.  *See, e.g.*, RAB 3, 56.

Production of the administrative record (nearly a year after the hearing) has

not revealed any information that would yield a different conclusion.  The record

highlights the difficulties with such a methodology.  *See* POB 63-64.  Intervenors

cite nothing in the record to the contrary.  They cite to the Rule itself (IOB 41-42),

but the Rule on its face provides no formula, criteria, or guidance specific to such a

calculation.  They cite to the preamble to the Rule and slides from an ONRR

training session (IOB 42), but a review of those documents confirms that they

provide no formula, criteria, or guidance on the calculations required to perform a

netback from electricity sales.  Ultimately, the Intervenors fall back on an

argument that valuation is complex and lessees should seek out individual

25

guidance.[10]  IOB 42-43.  But that argument only underscores that the agency (and Intervenors) have no idea how to implement such a netback.

### 3. *The Rule Arbitrarily Applies Geothermal Allowances to Coal.*

Federal Respondents do not defend application of geothermal generation and transmission allowances to coal.  Indeed, their response brief is silent on the issue.

Intervenors do not dispute any of Petitioners' arguments explaining why these provisions of the 2016 Rule are arbitrary and should be set aside.  *See* POB 86-88.  Instead, they assert these provisions should nonetheless be retained because they are to be used only "if 'applicable' so lessees are not required to use them if not appropriate."  IOB 58-59.  Intervenors' position makes no sense because geothermal resources are fundamentally different from coal, and the geothermal generation and transmission allowances therefore *never* would be appropriate to value coal.  *See* POB 86-88.

### 4. *Valuation of Coal Based on Electricity Sales Violates Due Process.*

It is undisputed that the principles finding a requirement to be void for

---

[10] Intervenors cite to a declaration from former ONRR Director Gregory Gould (IOB 43) which is part of the record of this case but not part of the administrative record.  If the Court considers the Gould declaration, then the Court should also consider the declarations of Joe Leingang [ECF No. 23-8 at ¶¶ 10-11], Barry W. Ingold [ECF No. 23-9 at ¶¶ 11-34, 36], and Shawn McKinsey [ECF No. 59-1 at ¶¶ 3-9] establishing the functional impossibility of performing a netback from electricity and the lack of guidance or training from ONRR on how to perform such a calculation.

26

vagueness and therefore a violation of due process apply to economic regulation as well as speech.  *See, e.g., FCC v. Fox TV Stations, Inc.*, 567 U.S. 239, 253 (2012).  Moreover, Petitioners agree with Intervenors that one articulation of the void for vagueness test is that the rule in question is "so vague and indefinite as really to be no rule or standard at all."  IOB 44.  That is an apt description of the Rule's provisions requiring coal to be valued based on electricity sales.  The Rule, the preamble to the Rule, and the administrative record are all silent on how lessees should perform the proposed netback from electricity sales.  *See* POB 63.  The record reflects that the proposed netback would be "difficult, if not impossible to apply in any logical, consistent and accountable fashion."  *See* AR_73461, AR_73467; *see also* AR_73462, AR_73616, AR_73624, AR_73734-86, AR_73489-90, AR_73943, AR_73944.  Yet during the rulemaking culminating in the 2016 Rule, ONRR continued to leave "[t]he dividing line between what is lawful and unlawful . . . to conjecture," thereby making this provision of the Rule so vague as to violate due process.  *See Connolly v. Gen. Const. Co.*, 269 U.S. 385, 393 (1926).

>        5.    *The "Coal Cooperative" Definition Is Arbitrary and Capricious.*

Federal Respondents now concur with Petitioners that the "coal cooperative" definition in the 2016 Rule cannot stand.  For their part, Intervenors also do not dispute that the Rule's "coal cooperative" definition ignores the agency's

longstanding analytical framework based on facts of ownership and control to determine whether a relationship is an "affiliation" such that transactions should be treated as non-arm's-length.  That fact-based analytical framework is still part of the Rule for entities that do not fall within the definition of "coal cooperative."  *See* 30 C.F.R. § 1206.20 (definition of "affiliate").

In an attempt to save the new "coal cooperative" definition, Intervenors only point to general comments in the administrative record about the need for policy reform leading to abandonment of the prior benchmark system that had applied to all non-arm's-length transactions.  *See* IOB 50-51.  But they point to nothing in the record that connects the new "coal cooperative" definition to resolution of any concerns with the prior benchmark system.  Nor do they point to any facts in the record showing that *all* entities defined as "coal cooperatives" in the 2016 Rule necessarily would meet any of the ownership or control criteria under the agency's well-established analytical framework to determine an "affiliate."  Their citations to the preamble in the Federal Register notice for the final Rule or draft versions of the Rule do not contain any such facts.

In search of some factual support for the 2016 Rule's definition, Intervenors infer from introductory statements in two public comments that two entities buying coal from one mine with federal coal leases have a relationship with one another. IOB 48-49.  But they point to no facts in the record indicating that this inferred

relationship means one of these entities "owns" or has "control" over the other and that therefore they are "affiliates" and their transactions should necessarily be considered to be non-arm's-length.  Nor do Intervenors provide any factual basis for applying this inferred relationship between two entities to *all* entities falling within the 2016 Rule's definition of "coal cooperative."  In light of the lack of record facts regarding ownership or control within coal cooperatives showing that they are all "affiliates" such that their transactions are necessarily non-arm's-length, the Court should set aside the 2016 Rule's definition of "coal cooperatives" as arbitrary and capricious.

**G.     The Rule's Forcing of Netbacks from Distant Coal Sales Is Arbitrary and Capricious.**

Even where the Rule purports to value the correct commodity, its singular compelled methodology of valuing coal via netback from the physical sales point cannot withstand scrutiny.  The Rule repeals the existing system of benchmarks for valuing coal that is initially sold non-arm's-length, and replaces it with a uniform mandate for coal lessees to utilize netbacks from the affiliate's first arm's-length sales point regardless of factual circumstances.  But as Petitioners' opening brief explained, and ONRR has long recognized, such complex netbacks are the least reliable valuation method.  *See* POB 19-21, 69-76; *see also* 54 Fed. Reg. 1,492, 1,506 (Jan. 13, 1989) ("[ONRR] will use a net-back valuation method only when other methods of determining value, such as those specified in the rules, are

inapplicable."); *id.* at 1,514 ("The benchmark system has been adopted in order to provide certainty in valuing coal for royalty purposes."); 53 Fed. Reg. at 1,186 ("To routinely perform labor-intensive net-back calculations is impractical."). The Rule further compounds this uncertainty by requiring a netback from the physical sales point rather than the first point where value may be determined, and by failing to specify how to compute netbacks for coal where the first arm's-length sale occurs far from the lease. *See* POB 74-75, 84-86.

Respondents do not dispute any of these points. In fact, the government's brief earlier acknowledges the problems with netback-based valuation for federal gas. RAB 34 ("While arm's-length sales are generally the best measure of market value, the royalty calculations can be very complex."). Thus, for federal gas not initially sold arm's-length, the Rule afforded an index-based option that "'avoids the requirements to unbundle fees and "trace" production' which may be preferable 'when there are numerous non-arm's-length sales prior to an arm's-length sale.'" *Id.* Nonetheless, for federal and Indian coal not initially sold arm's-length, the Rule invariably mandated such requirements and denied any optionality.

The Rule's inconsistency is unexplained in the record, and inexplicable. Federal Respondents nowhere illuminate how mandating netbacks purportedly "create[s] a consistent valuation regime." RAB 41. The Rule fails to justify its elimination of benchmarks for lessee valuation of coal, but its retention of the very

same benchmarks for ONRR valuation of the same coal under its "default provisions." *See* RAB 49; 30 C.F.R. §§ 1206.144(a)-(c), 1206.254(a). The Rule fails to excuse its rejection of available coal indexes or other alternatives to chasing gross proceeds for coal sales. *See* POB 75-76. Federal Respondents conflictingly tout both "different valuation methods for [] different industries" and that "the 2016 Valuation Rule ensured consistent valuation methods for federal gas, oil, and coal and Indian coal." *See* RAB 41, 43. Additionally, the Rule's netback methodology provides no concrete guidance on what transportation costs lessees may deduct, thus generating uncertainty and readily inviting ONRR's use of the default provision many years after-the-fact. *See* POB 85-86.

On this last point, Federal Respondents' fallback argument that ONRR need not value coal "at the mine" is irrelevant and self-contradictory because the Rule and record make no such claim, and instead purport to preserve this key tenet of coal valuation. *See* RAB 42-43; *Motor Vehicle Mfrs. Ass'n,* 463 U.S. 29, 50 (1983) ("[T]he courts may not accept appellate counsel's post hoc rationalizations for agency action."); *Olenhouse*, 42 F.3d at 1565 ("[Courts] must find and identify substantial evidence to support the agency's action and may affirm agency action, if at all, only on the grounds articulated by the agency itself."); RAB 7 (simultaneously arguing that the Rule "reaffirmed" that royalty value "is determined at or near the lease"). Indeed, the Rule does not purport to deny all

31

coal transportation allowances back to the mine.

Their fallback argument is also incorrect, citing no coal-related authority, failing to distinguish Petitioners' extensive cited authority, and ignoring the agency's and courts' long-stated position aligned with Petitioners.  *See* POB 9-16; former 30 C.F.R. § 1206.251 (2015) ("Net-back method means a method for calculating market value of coal *at the lease or mine*.") (emphasis added). Respondents' citation of *Amoco Prod. Co. v. Watson* is inapposite; rather than dispensing with transportation allowances, that case merely found that, under the specific facts of the ONRR orders to an individual company, untreated gas at the wellhead was not in marketable condition and the lessee could not deduct as transportation the costs of removing excess carbon dioxide gas which was not royalty-bearing.  410 F.3d 722, 727, 731 (D.C. Cir. 2005).  ONRR is statutorily required under the MLA and the APA to define the value of coal by regulation and to justify its changes to longstanding regulations with substantial evidence in the factual record.  *See* 30 U.S.C. § 207(a); 5 U.S.C. § 706; *Olenhouse*, 42 F.3d at 1576.

Respondents have no answers to these deficiencies in the Rule's coal valuation provisions.  And again, they fail to correlate their perceived benefits of these changes with the Rule's own prediction of no associated coal royalty benefit.

**H.      The Rule's "Default Provisions" and Unbounded Triggers for ONRR Unilateral Valuation Are Arbitrary and Capricious.**

As Petitioners detailed, the Rule's "default provisions" applicable across oil, gas, and coal valuation are materially different than prior regulations.  *See* POB 88-96.  Most notably, they undercut the core tenet of lessee responsibility for determining value in the first instance, and instead relegate valuation to a black box.  *See* POB 21-23; RAB 4.  In response, Respondents again just invoke "discretion" and again aver that prior regulations equally enabled ONRR to second-guess lessees' valuation, even under arm's-length agreements, despite also conceding that the default provisions are "new."  *See* RAB 9.  This failure to even acknowledge the Rule's changes is alone fatal.  *See Wyoming*, 493 F. Supp. 3d at 1084 (first step to reasonably explain a rule change is that an agency "displays 'awareness that it is changing position'") (quoting *Fox*, 556 U.S. at 515).

Intervenors assert that the default provisions and triggers "simply sought to promote transparency and regulatory certainty," but nowhere explain how they do so.  *See* IOB 35.  In fact, they achieve the opposite of the Rule's purported aims.  As Petitioners have shown, the Rule includes no sideboards on now-standardless ONRR discretion to upend prior royalty reporting and payment years after-the-fact.  For coal, the Rule inexplicably allows ONRR to consider factors (e.g., other sales of same area coal) that the Rule deems insufficiently reliable for lessees to use.  *See* IOB 54, n.16.  Intervenors also mislabel the default provisions as an "auditing

measure," when in fact they are far broader and the Rule does not affect ONRR's preexisting audit authority.  *See, e.g.*, IOB 63.

The default provisions' problems are only heightened by the Rule's nearly limitless circumstances in which ONRR may invoke them and "decide your value."  *See* RAB 49 ("The Rule does empower ONRR to determine whether it is necessary to apply the default provision."); IOB 10 (suggesting use of default provisions whenever lessee valuation is "insufficient or unreliable").  For example, the Rule allows ONRR to cast aside valid contracts, even those that are arm's-length, merely if they are not physically signed by all parties.  *See* POB 54-56.  Respondents fail to link any valuation accuracy or auditing concerns with the specific full signatures requirement added by the Rule.  Nor do they account for the fact that lessees remain responsible for retaining sufficient records and justifying their reporting and payment during an audit.  *See* 30 U.S.C. § 1713; 30 C.F.R. part 1212.  Intervenors' answer to the Rule's conflicting and far broader definition of "contract" in 30 C.F.R. § 1206.20 is to baselessly suggest that it has no operative effect within the Rule.  *See* IOB 33-34; *Baude v. United States,* 955 F.3d 1290, 1305 (Fed. Cir. 2020) ("a statute or regulation 'should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant'") (citation omitted).

Respondents likewise cannot rebut the circularity or arbitrariness of the

Rule's "10 percent" thresholds to find prices "reasonable" or "unreasonable." *See* POB 56-58. They have no response to the Rule's silent deletion of former 30 C.F.R. §§ 1206.102(c)(2)(ii)(A) and (B) (2015) that expressly protected federal oil lessees against allegations of misconduct based solely on market shifts. *See* POB 18-19. Nor do they rationalize the Rule's drastic remedy of ONRR's unilateral revaluation of production based on whatever factors ONRR sees fit, particularly where ONRR does not even need to first establish that a lessee's reporting is noncompliant. *See* POB 95-96. Federal Respondents' brief also cannot walk back the Rule by stating ONRR only "may" use this "possible basis" to substitute its own royalty valuation. *See* RAB 37. ONRR must follow its regulations, and they are not any less arbitrary if ONRR somehow chooses to ignore them. Federal Respondents' simplistic assertion that "lessees determine how to conduct reporting, and can conform their operations and behavior accordingly" to avoid the default provisions misses the point that lessees by their actions cannot secure such certainty because ONRR now can displace lessee valuation under the default provisions for almost any reason. *See* RAB 50.

Lastly, there is nothing "hypothetical" regarding lessees' inability to meaningfully appeal ONRR default provision revaluations. *See* RAB 51-52. Respondents do not refute ONRR's inability to share confidential lessee information, such as other comparable sales in the area. *See* POB 90; 30 C.F.R.

35

§§ 1206.109(a), 1206.149(a), 1206.259(a); IOB 51 (conceding "lessees' lack of access to competitors' information on comparable sales").  Regardless if ONRR relies on such information, it will be unavailable to an appellant.  Federal Respondents' facile assertion that lessees "may appeal," and citations to cases generally involving ONRR disputes, fail to examine this or any aspect of such an appeal.  *See* RAB 51-52.  Nor can the Rule's preamble assurances—which are *not* "the text of the Rule" as the government claims—control over the term of the Rule itself.  *See* RAB 52; *Marinello v. United States*, 138 S. Ct. 1101, 1109 (2018) (courts may not rely on "the assumption that the Government will use [prosecutorial power] responsibly").  And while Federal Respondents do not actually challenge the Petitions' ripeness, the Petitions squarely present legal arguments requiring no further factual development.  *See Nat'l Ass'n of Home Builders v. U.S. Army Corps of Engineers*, 417 F.3d 1272, 1282 (D.C. Cir. 2005) ("We have also often observed that a purely legal claim in the context of a facial challenge, such as the appellants' claim, is presumptively reviewable.") (citations omitted); *Phillips Petroleum Co. v. Lujan*, 760 F. Supp. 882, 883 (N.D. Okla. 1989).  Federal Respondents' cited cases are inapposite.  *See, e.g.*, *S. Utah Wilderness All. v. Burke*, 908 F.3d 630, 635-36 (10th Cir. 2018) (premature challenge to settlement agreement with vague terms).

## I.   **Remedy.**

Petitioners' position all along has been that the entire 2016 Rule should be vacated, as stated in their Petitions.  Vacatur is the presumptive remedy for an unlawful rule.  *High Country Conservation Advocates v. U.S. Forest Service*, 951 F.3d 1217 (10th Cir. 2020) ("Vacatur of agency action is a common, and often appropriate form of injunctive relief granted by district courts."); *Wyoming*, 493 F. Supp. 3d at 1085 ("Except in limited circumstances, vacatur is the typical and appropriate remedy under the APA for unlawful agency action.").  Indeed, full vacatur was the Northern District of California's ordered remedy for ONRR's 2018 valuation rule challenged by Intervenors, despite that the court did not even address that rule's key challenged provisions such as on deepwater movement of bulk oil and gas.  This Court should grant that same requested relief for the 2016 Rule given the Rule's many and serious deficiencies, some of which extend across oil, gas, and coal valuation.  If ONRR sees fit to adopt a new rule—or to duly implement the most recent rule it already adopted earlier this year—it may attempt to do so via the normal APA notice and comment rulemaking process.

In the alternative, if the Court determines total vacatur is inappropriate, the Court may consider a partial remedy.  Courts "may partially set aside a regulation if the invalid portion is severable, that is, if the severed parts operate entirely independently of one another, and the circumstances indicate the agency would

37

have adopted the regulation even without the faulty provisions." *Wyoming*, 493 F.

Supp. 3d at 1086 (citing *High Country Conservation Advocates*, 951 F.3d at 1228-

29).  Courts however do not typically engage in a line-item exercise and must take

care not to create a new rule that the agency never promulgated.  *See NRDC v.*

*EPA*, 489 F.3d 1250, 1261 (D.C. Cir. 2007) (because the challenged rule would

"change substantially as a result of" the vacatur of a portion of the rule, the rule

"should be vacated in its entirety and remanded for [the agency] to repromulgate");

*Wyoming*, 493 F. Supp. 3d at 1086 (vacating the challenged rule's amendments to

one entire subpart of the regulations, and preserving its unchallenged amendments

to a separate subpart).

   In an effort to limit their losses on the Rule's coal valuation provisions,

Federal Respondents propose to redline away the coal valuation provisions that

they belatedly agree are invalid.  However, as also explained in Petitioners'

Oppositions to Federal Respondents "Motion for Final Judgment," this proposal is

untenable and unworkable.  *See* ECF Nos. 95 and 96.  Rather, the Rule's coal-

related provisions are inextricably intertwined and thus not severable in the manner

Federal Respondents propose.  Consistent with the Court's preliminary injunction

ruling, severance "would appear to cause more problems than it solves because the

entire new methodology has been re-written based on new definitions . . . ." *Cloud*

*Peak*, 415 F. Supp. 3d at 1052-53.  Moreover, eliminating the Rule's entire

methodology for valuing coal that is not sold or is utilized by a coal cooperative creates a gap in the regulations. The Rule would afford no methodology for valuing such coal, instead forcing coal lessees to make case-by-case proposals to ONRR and subjecting them to the default provisions. *See* 30 C.F.R. §§ 1206.252(b)(1) & (e), 1206.452(b)(1) & (e). Federal Respondents also fail to explain why vacating those provisions—i.e., rendering them null *ab initio*—would not reinstate the preexisting regulatory benchmarks.

Federal Respondents argue a straw man that coal "Petitioners are not entitled to any particular valuation method, and thus cannot be legally deprived of one." *See* RAB 41. But the Rule should not refuse to endorse *any* method for coal— especially since, as the government's brief admits, the Rule expects lessees to continue performing valuation in the first instance. *See* RAB 4 ("Lessees are responsible, in the first instance, for accurately calculating and paying royalties."). Indeed, Respondents have no response to the MLA's requirement that the value of coal be "defined by regulation." 30 U.S.C. § 207(a).[11] Thus, the Court should vacate the Rule's already-enjoined coal valuation provisions.

With respect to federal oil and gas, the Rule's provisions unduly foreclosing transportation and processing allowances are most readily severable. *See supra*

---

[11] The government's brief is silent on this MLA provision. Intervenors' suggestion that it is "waived" is baseless. *See* IOB 69-70. Petitioners plainly briefed it, and its plain import requires no further explication. *See* POB 10, 83-84, 100.

Section C & D; POB 35.  The Rule's improper redefinition of subsea gathering is severable.  Intervenors concede as much.  IOB 71 ("For example, the rescission of the Deep Water Policy affects only the final clause of the definition of 'gathering' at section 1206.20, and the isolated provisions at sections 1206.110(a)(1)(ii) and 1206.152(a)(2)(ii).").  The same is true for the Rule's hard caps on transportation and processing allowances.  *See* 30 C.F.R. §§ 1206.110(d)(1) & (2), 1206.152(e)(1) & (2), and 1206.159(c)(2), (3), & (4).  Severing these allowance-based provisions does not otherwise affect any larger valuation methodology.  The identified flaws in the index-based methodology are also severable by removing the requirements to use the "highest" reported monthly bidweek price and to ignore the destinations to which gas can actually flow.  To the extent Respondents rely on ONRR's latest (2021) valuation rule to show an intent to sever the Rule's coal provisions—an argument Federal Respondents appear to have since abandoned, mentioning that rule only in a footnote, *see* RAB 19 n.2—that same rule's prospective removal of contested oil and gas provisions shows their severability.

## **CONCLUSION**

For the reasons above and in Petitioners' Opening Brief, the Court should grant the Petitions and vacate the 2016 Rule.

Dated this 10th day of June, 2021.

Respectfully submitted,

*/s/ Keith S. Burron*
Keith S. Burron, WSB No. 5-2884
The Burron Firm, P.C.
1695 Morningstar Road
Cheyenne, WY 82009
Phone:  (307) 631-7372
keith@burronlaw.com

Peter J. Schaumberg, *pro hac vice*
James M. Auslander, *pro hac vice*
BEVERIDGE & DIAMOND, P.C.
1900 N Street, NW, Suite 100
Washington, DC 20036
Phone: (202) 789-6009
pschaumberg@bdlaw.com
jauslander@bdlaw.com

**ATTORNEYS FOR PETITIONERS AMERICAN PETROLEUM INSTITUTE, NATIONAL MINING ASSOCIATION, AND WYOMING MINING ASSOCIATION**

*/s/ Walter F. Eggers* (with permission)
Walter F. Eggers, III, WSB No. 6-3150
HOLLAND & HART LLP
2515 Warren Ave., Suite 450
Cheyenne, WY  82001-1347
Phone: (307) 778-4200
weggers@hollandhart.com

John F. Shepherd, *pro hac vice*
Tina Van Bockern, *pro hac vice*
HOLLAND & HART LLP
555 17th Street, Suite 3200
Denver, Colorado 80202

41

Phone: (303) 295-8000
jshepherd@hollandhart.com
trvanbockern@hollandhart.com

**ATTORNEYS FOR PETITIONER CLOUD PEAK
ENERGY *INC.***


*/s/ R. Kirk Muller* (with permission)
R. Kirk Muller, WSB No. 5-2420
Gail L. Wurtzler, *pro hac vice*
Kathleen C. Schroder, *pro hac vice*
DAVIS GRAHAM & STUBBS LLP
1550 Seventeenth Street, Suite 500
Denver, CO 80202
Phone: (303) 892-9400

**ATTORNEYS FOR PETITIONER TRI-STATE
GENERATION AND TRANSMISSION ASS'N
*INC.***


*/s/ Rex E. Johnson* (with permission)
Rex E. Johnson, WSB No. 5-1845
Brian D. Artery, WSB No. 7-4819
SHERARD, SHERARD, ARTERY &
JOHNSON
602 10th Street
Wheatland, WY 82201
Phone: (307) 322-5555
rex@ssjwyolaw.com
bartery@ssjwyolaw.com

**ATTORNEYS FOR PETITIONERS BASIN
ELECTRIC POWER COOPERATIVE AND
WESTERN FUELS WYOMING, *INC.***

## CERTIFICATE OF COMPLIANCE

I hereby certify that this joint brief complies with the type-volume limitation set forth L.R. 83.6(c) and the Court's October 26, 2020 Order, ECF No. 86 in the lead case, because this joint brief contains 9,772 words as calculated by Microsoft Word 2016, excluding parts of the brief exempted by Fed. R. App. P. Rule 32(f). This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Times New Roman 14 point font in Microsoft Word 2016.

*/s/ Keith S. Burron*
Keith S. Burron

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of June, 2021, the foregoing Petitioners' Joint Reply Brief was served by filing a copy of the document with the Court's CM/ECF system, which will send notice of electronic filing to counsel of record.

*/s/ Keith S. Burron*
Keith S. Burron