## UNITED STATES DISTRICT COURT
## DISTRICT OF WYOMING

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING
2021 SEP -8 PM 1: 13
MARGARET BOTKINS, CLERK
CASPER

| | |
|---|---|
| CLOUD PEAK ENERGY INC.; NATIONAL MINING ASSOCIATION; and WYOMING MINING ASSOCIATION, | |
| Petitioners, | |
| v. | No. 19-CV-120-SWS **(Lead Case)** |
| UNITED STATES DEPARTMENT OF THE INTERIOR; *et al.*, | |
| Respondents. | |
| AMERICAN PETROLEUM INSTITUTE; | |
| Petitioner, | |
| v. | No. 19-CV-121-SWS (Joined Case) |
| UNITED STATES DEPARTMENT OF THE INTERIOR; *et al.*, | |
| Respondents. | |
| TRI-STATE GENERATION AND TRANSMISSION ASS'N, INC.; BASIN ELECTRIC POWER COOPERATIVE; and WESTERN FUELS-WYOMING, INC., | |
| Petitioners, | |
| v. | No. 19-CV-126-SWS (Joined Case) |
| DAVID BERNHARDT, in his official capacity as Secretary of the U.S. Department of Interior; *et al.* | |
| Respondents. | |

## ORDER UPHOLDING IN PART AND REVERSING IN PART 2016 VALUATION RULE

These joined cases come before the Court under the Administrative Procedure Act (APA), 5 U.S.C. § 706, for review of a rule promulgated in 2016 by the Office of Natural Resources Revenue (ONRR), which effectively changed how royalties owed to the federal government were calculated on oil, gas, and coal produced from federal lands and offshore leases as well as coal produced from Indian lands.  The administrative record has been submitted (Doc. 80), and the matter fully briefed by the parties.[1]  (Docs. 89, 97, 102, 106.[2]) Additionally, the Court also considered the parties' briefing on Federal Respondents' Motion for Final Judgment (Docs. 87, 88, 95, 96, 98, 101) as part of the record in this case. Consistent with its earlier partial preliminary injunction (Doc. 67), the Court finds the new valuation methods for oil and gas are sufficiently supported, but the new valuation methods for federal and Indian coal must be vacated.

## BACKGROUND

Oil, gas, and coal producers often enter into leases with the federal government or Indian tribes to extract natural resources from onshore federal lands, offshore federal areas, and Indian lands.  *California v. United States Dep't of the Interior*, 381 F. Supp. 3d 1153, 1158 (N.D. Cal. 2019).  Of relevance here, these areas are regulated by federal law, including the Mineral Leasing Act (MLA), 30 U.S.C. § 181 *et seq.* (as to onshore federal lands), the Outer Continental Shelf Lands Act (OCSLA), 43 U.S.C. § 1331 *et seq.* (as to offshore federal areas), and 25 U.S.C. § 396 *et seq.* (as to Indian and allotted lands).

---

[1] The Court concludes oral argument would not materially assist in the consideration of this review.  *See* Local Civil Rule 83.6(c).  The Court carefully considered the parties' extensive briefing and reviewed the more than 1,100 documents comprising the administrative record (Doc. 80).  Consequently, the Court has all the information necessary to render its decision.

[2] All citations to the record are to the lead case, Case No. 19-CV-120, unless otherwise noted.

Federal law requires the lessees to pay royalties to the federal government based on the "value" of the fossil fuels extracted. *E.g.*, 30 U.S.C. § 207(a) (federal coal); 30 U.S.C. § 226(b)(1)(A) (onshore federal oil and gas); 43 U.S.C. § 1337(a)(1) (offshore federal oil and gas from the Outer Continental Shelf). For oil and gas extracted from onshore federal lands, lessees are statutorily required to pay royalty of "not less than 12.5 percent in amount or value of the production removed or sold from the lease." 30 U.S.C. § 226(b)(1)(A). For offshore oil and gas extracted from the Outer Continental Shelf, royalty is owed "at not less than 12½ per centum fixed by the Secretary in amount or value of the production saved, removed, or sold." 43 U.S.C. § 1337(a)(1)(A). For coal extracted from federal lands, royalty is owed "in such amount as the Secretary shall determine of not less than 12½ per centum of the value of coal as defined by regulation." 30 U.S.C. § 207(a). There is no equivalent statutory language for coal extracted from Indian lands, but regulations treat it essentially identical to coal from federal lands.

Congress requires the Department of Interior (DOI) Secretary to collect the royalties owed to the United States on those leases. 30 U.S.C. § 360; 30 U.S.C. § 1711; 30 U.S.C. § 1751. To that end, the DOI Secretary is required to "prescribe necessary and proper rules and regulations and to do any and all things necessary to carry out and accomplish the purposes" of the various leasing statutes. 30 U.S.C. § 189 (MLA); 43 U.S.C. § 1334 (OCSLA). Relatedly, the Federal Oil and Gas Royalty Management Act of 1982 (FOGRMA) directed the DOI Secretary to establish "a comprehensive inspection, collection and fiscal and production accounting and auditing system to provide the capability to accurately determine oil and gas royalties, interest, fines, penalties, fees,

deposits, and other payments owed, and to collect and account for such amounts in a timely manner." 30 U.S.C. § 1711(a).  The DOI Secretary in turn created Respondent Office of Natural Resources Revenue (ONRR), previously known by other designations, and delegated the royalty accounting tasks to ONRR.  Additionally, as the statutes do not define the "value" of the production, the DOI Secretary and ONRR possess the authority and discretion to do so.

In May 2011, ONRR published two advance notices of proposed rulemaking.  The first sought public comments and suggestions concerning potential changes to how federal oil and gas were valued for royalty purposes.  *Federal Oil and Gas Valuation*, 76 Fed. Reg. 30878 (May 27, 2011) (AR 214-217[3]).  The second requested public comments and suggestions regarding potential changes to how Federal and Indian coal was valued. *Federal and Indian Coal Valuation*, 76 Fed. Reg. 30881 (May 27, 2011) (AR 218-221). For each, ONRR said it intended to

> provide regulations that would offer greater simplicity, certainty, clarity, and consistency in production valuation for mineral lessees and mineral revenue recipients; be easy to understand; decrease industry's costs of compliance; and provide early certainty to industry and ONRR that companies have paid every dollar due.  The ONRR intends that the final regulations will be revenue neutral.

79 Fed. Reg. at 30878, 30881 (AR 214, 218.)

Following the comment periods as well as six public workshops, ONRR published a proposed rule in January 2015 ("the Proposed Rule"), which sought to change how federal oil, gas, and coal as well as Indian coal would be valued when calculating royalties.

---

[3] Citations to the administrative record take the following format: (AR [Bates Number].)

*Consolidated Federal Oil & Gas and Federal & Indian Coal Valuation Reform*, 80 Fed. Reg. 608 (Jan. 6, 2015) (AR 771-839).   In July 2016, following an extended public comment period, ONRR then published the final rule ("the 2016 Valuation Rule"), which enacted most of the amendments first set forth by ONRR in its proposed rule.  *Consolidated Federal Oil & Gas and Federal & Indian Coal Valuation Reform; Final Rule*, 81 Fed. Reg. 43338 (July 1, 2016) (AR73963-74028).   The 2016 Valuation Rule effectively changed how lessees calculate the value of the natural resources in order to pay royalties on oil, gas, and coal produced from federal lands and offshore leases as well as coal produced from Indian lands.

On December 29, 2016, Petitioners filed challenges to the 2016 Valuation Rule in this Court.[4]  However, those Petitions were voluntarily dismissed in November 2017 due to ONRR's later "repeal" of the 2016 Valuation Rule.  (16-CV-319, Doc. 23.)  In early 2017, ONRR postponed the 2016 Valuation Rule's effective date and then undertook the rulemaking process to pass another rule ("the Repeal Rule") that repealed the 2016 Valuation Rule, leaving the former valuation methods unchanged.  *Repeal of Consolidated Federal Oil & Gas and Federal & Indian Coal Valuation Reform*, 82 Fed. Reg. 36934 (Aug. 7, 2017).  However, in October 2017, the States of California and New Mexico, joined by other groups as intervenor-plaintiffs, filed suit in the Northern District of California to challenge the Repeal Rule under the APA.  *California v. United States Dep't of the Interior*, 381 F. Supp. 3d 1153, 1158 (N.D. Cal. 2019).  On March 29, 2019, the

---

[4] *Cloud Peak Energy Inc., et al. v. USDOI*, Case No. 16-315; *API v. USDOI*, Case No. 16-316; and *Tri-State Generation and Transmission Ass'n, et al. v. USDOI*, Case No. 16-319.

Northern District of California granted summary judgment in the plaintiffs' favor, vacating the Repeal Rule after finding ONRR violated the APA when adopting it. *Id.* at 1179. In an all too familiar cycle, this effectively reinstated the now-not-repealed 2016 Valuation Rule.[5]  In June 2019, ONRR issued a "Dear Reporter" letter that announced the 2016 Valuation Rule applies to "all federal oil and gas lessees and all federal and Indian coal lessees" from January 1, 2017 forward, and required full compliance to occur by January 1, 2020. (Doc. 23-3 p. 1.) "This means that lessees must come into compliance [with the new royalty calculation methods] retrospectively for the last two and a half years and prospectively by January 1, 2020." (Doc. 23 p. 11.[6])

Petitioners here either directly produce commodities and pay royalties on such production, represent those who do (such as trade associations), or are otherwise subject to the 2016 Valuation Rule (such as those who fall within the new "coal cooperative" definition). (Doc. 89 pp. 16-20.) They seek here to set it aside under the APA, arguing it is arbitrary and capricious and exceeds ONRR's authority. Shortly after filing this judicial review action, Petitioners moved for a preliminary injunction to avoid having to comply with the 2016 Valuation Rule during the pendency of the judicial review process. (Doc. 22.) After briefing and a hearing on the motion, the Court granted in part and denied in part the motion. *Cloud Peak Energy Inc. v. United States Dep't of Interior*, 415 F. Supp. 3d 1034, 1039 (D. Wyo. 2019). The Court preliminarily enjoined the 2016 Valuation

---

[5] *See State of Wyoming and State of Montana v. United States Department of the Interior, et al.*, 16-CV-0285, Order on Petitions for Review of Final Agency Action (D. Wyo. Oct. 8, 2020).
[6] The Court cites to the page numbers at the top of each page assigned to the document by the CM/ECF system, as opposed to the page numbers at the bottom of each page assigned by counsel.

Rule's application to federal and Indian coal royalties, which meant the pre-2016 valuation methodologies would continue to govern as to coal. *Id.* at 1053. The Court refused to preliminarily enjoin the 2016 Valuation Rule as to valuing federal oil and gas, *id.*, and those provisions have been in effect for the last year and a half.

As it sits now, Petitioners still ask that the entire 2016 Valuation Rule be vacated in its entirety as violating the APA. (Docs. 89, 106.) Federal Respondents now agree that at least certain provisions concerning coal valuation are unworkable and should be vacated, but contend the federal oil and gas provisions should remain untouched. (Doc. 97.) Respondent-Intervenors argue the 2016 Valuation Rule should be upheld in its entirety and the preliminary injunction should be dissolved. (Doc. 102.)

## STANDARD OF REVIEW OF AGENCY ACTION

"Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 260 (1999) (internal quotation marks omitted). The Administrative Procedure Act includes a limited waiver of sovereign immunity that allows for judicial review of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. The APA sets forth the full extent of a court's authority to review an agency's action and provides in relevant part as follows:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--
> ...
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be--
>    (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

> ...
> (C)     in excess of statutory jurisdiction, authority, or
>         limitations, or short of statutory right[.]
>
> ...
> In making the foregoing determinations, the court shall review the whole
> record or those parts of it cited by a party, and due account shall be taken of
> the rule of prejudicial error.

5 U.S.C. § 706(2)(A), (C).  Reviewing agency action for its accordance with law is largely

straightforward.  In contrast, much has been written of the arbitrary-or-capricious standard.

When reviewing agency action under the arbitrary-or-capricious standard, the Court

focuses on the decision-making process, not on its wisdom or "correctness."  *Olenhouse v.*

*Commodity Credit Corp.,* 42 F.3d 1560, 1575 (10th Cir. 1994).  Under this "narrow"

standard of review, the U.S. Supreme Court has said that

> an agency rule would be arbitrary and capricious if the agency has relied on
> factors which Congress has not intended it to consider, entirely failed to
> consider an important aspect of the problem, offered an explanation for its
> decision that runs counter to the evidence before the agency, or is so
> implausible that it could not be ascribed to a difference in view or the product
> of agency expertise.

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29,

43 (1983).  "The duty of a court reviewing agency action under the 'arbitrary or capricious'

standard is to ascertain whether the agency examined the relevant data and articulated a

rational connection between the facts found and the decision made."  *Olenhouse,* 42 F.3d

at 1574 (citing *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43).  The Court does not substitute

its judgment for the agency's and should "uphold a decision of less than ideal clarity if the

agency's path may reasonably be discerned."  *F.C.C. v. Fox Television Stations, Inc.,* 556

U.S. 502, 513–14 (2009) (internal citations omitted).  When conducting this analysis, the

Court's inquiry "must be thorough, but the standard of review is very deferential to the agency." *Defs. of Wildlife v. Everson*, 984 F.3d 918, 934 (10th Cir. 2020) (quoting *W. Watersheds Project v. Bureau of Land Mgmt.*, 721 F.3d 1264, 1273 (10th Cir. 2013)). Indeed, the Court must "presume that an agency action is valid unless the party challenging the action proves otherwise." *Id.* (quoting *Hays Med. Ctr. v. Azar*, 956 F.3d 1247, 1264 (10th Cir. 2020)); *see also Copar Pumice Co. v. Tidwell*, 603 F.3d 780, 793 (10th Cir. 2010) ("In performing arbitrary and capricious review, we accord agency action a presumption of validity; the burden is on the petitioner to demonstrate that the action is arbitrary and capricious.").

## DISCUSSION

As at the preliminary-injunction stage, the Court will consider the 2016 Valuation Rule's oil and gas royalty provisions together due to their similarities.

### 1. As to the federal oil and gas provisions, Petitioners have not shown the 2016 Valuation Rule is arbitrary, capricious, an abuse of discretion, or unlawful.

The Court separately considers and addresses each of Petitioners' arguments concerning the oil and gas provisions of the 2016 Valuation Rule.

### 1.1 ONRR did not exceed its legal authority by enacting the 2016 Valuation Rule as to the federal oil and gas provisions.

Petitioners alleged in the motion for preliminary injunction that ONRR exceeded its Congressionally-delegated authority by promulgating the 2016 Valuation Rule (Doc. 23 p. 19), but the Court rejected the argument at the time. *Cloud Peak Energy*, 415 F. Supp. 3d at 1045-46 (noting that Petitioners provided "little detailed argument on this issue"). In their reply brief, Petitioners appear to re-assert the same argument. (Doc. 106 p. 7

("Respondents again fail to meaningfully address, let alone rebut, Petitioners' legal and factual arguments for vacatur of the 2016 Rule as arbitrary and capricious and *ultra vires*.") To the extent Petitioners are again asserting ONRR acted outside its authority in enacting the 2016 Valuation Rule, that argument is again rejected as to the federal oil and gas provisions for the reasons previously set forth in the Court's preliminary-injunction order. *Cloud Peak Energy*, 415 F. Supp. 3d at 1045-46. The Court will not vacate the 2016 Valuation Rule as a whole, or the oil-valuation and gas-valuation provisions, based on this argument because it does not find that ONRR exceeded its lawful authority. The Court will proceed to examine the provision-specific arguments offered by the parties.

### 1.2 ONRR did not act arbitrarily and capriciously, abuse its discretion, or act unlawfully by discontinuing the "Deep Water Policy."

In the late 1990s, the production of oil and gas from deepwater areas of the Outer Continental Shelf (OCS) was being encouraged by the Government. (Doc. 89 pp 46-47.)

> Because of the substantial costs associated with deepwater development, and to minimize the number of platforms needed for development, not every lease had its own platform facility for development purposes. Rather, to move their bulk production, producers would connect a manifold located on the seafloor via a pipeline to a host platform on another lease that often was as far as 50 miles away.

(*Id.* p. 47.) ONRR's predecessor issued "Guidance for Determining Transportation Allowances for Production from Leases in Water Depths Greater Than 200 Meters" in 1999, known as the "Deep Water Policy," which provided that moving the oil or gas from the seafloor manifold to the first offshore platform constituted a deductible "transportation" allowance rather than non-deductible "gathering." (AR 1-2.)

As part of the 2016 Valuation Rule, ONRR revoked the Deep Water Policy by

redefining "gathering" to include movement from the seafloor to the platform and expressly disallowing such movement as transportation.  81 Fed. Reg. at 43340 (AR 73966); 30 C.F.R. § 1206.20 (defining gathering as "including any movement of bulk production from the wellhead to a platform offshore"); 30 C.F.R. § 1206.110(a)(1)(ii) ("For oil produced on the OCS, the movement of oil from the wellhead to the first platform is not [deductible] transportation."); 30 C.F.R. § 1206.152(a)(2)(ii) ("For gas produced on the OCS, the movement of gas from the wellhead to the first platform is not [deductible] transportation.").  Thus, the raw gas and oil is generally extracted from multiple wells to the seafloor manifold and then directed to the host platform, all of which is now considered non-deductible "gathering" rather than "transportation."

Unsurprisingly, Petitioners take much affront to the loss of this deduction. Petitioners contend ONRR's "blatant reversal" "amounts to a naked money grab unsupported by authority or evidence." (Doc. 89 pp. 46, 48.)  In the final 2016 Valuation Rule publication, ONRR explained its decision:

> The former Minerals Management Service [ONRR's predecessor] intended for the Deep Water Policy to incentivize deep water leasing by allowing lessees to deduct broader transportation costs than the regulations allowed. ONRR concluded that the Deep Water Policy has served its purpose and is no longer necessary.  The regulations still allow offshore lessees to deduct considerable transportation costs to move oil and gas from the offshore platform to onshore markets.  Rescinding this policy clarifies the meaning of gathering, which, in turn, provides a more consistent and reliable application of the regulations.

81 Fed. Reg. at 43340 (AR 73966).  Further, in the Section-By-Section Analysis of the January 2015 Proposed Rule, ONRR explained the Deep Water Policy did not comply with its definition of "gathering" and "lessees have taken transportation allowances under the

Deep Water Policy, in some instances, for movement ONRR considers non-deductible 'gathering' under its regulations." 80 Fed. Reg. at 624 (AR 788). Accordingly, ONRR rescinded the Deep Water Policy because it had effected its purpose of encouraging deep water leasing in the past and to apply more uniformly the "gathering" definition to all resources.

Obviously, ONRR's act of revoking the Deep Water Policy constituted a change of position.

> To be sure, the requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it is changing position. An agency may not, for example, depart from a prior policy sub silentio or simply disregard rules that are still on the books. *See United States v. Nixon*, 418 U.S. 683, 696, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). And of course the agency must show that there are good reasons for the new policy. But it need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates. This means that the agency need not always provide a more detailed justification than what would suffice for a new policy created on a blank slate. Sometimes it must—when, for example, its new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account. *Smiley v. Citibank (South Dakota), N. A.*, 517 U.S. 735, 742, 116 S.Ct. 1730, 135 L.Ed.2d 25 (1996). It would be arbitrary or capricious to ignore such matters. In such cases it is not that further justification is demanded by the mere fact of policy change; but that a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy.

*F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009) (emphases in original).

These requirements were satisfied here. ONRR certainly acknowledged that it was changing its position by revoking the Deep Water Policy, and doing so was within its authority. More to Petitioners' point, the Deep Water Policy undoubtedly engendered

serious reliance interests within the industry. (Doc. 89 p. 50 ("In turn, to justify their decisions over the last two decades to undertake the multi-billion dollar costs of deepwater OCS leasing and development, lessees reasonably relied on the ability to obtain deepwater OCS transportation allowances to recover the associated costs of this distant movement."); Doc. 23-4 ¶ 14.)  ONRR acknowledged and considered these reliance interests.  As ONRR explained in the Section-By-Section Analysis of the Proposed Rule, even under the Deep Water Policy, production movement to a central accumulation or treatment point was considered gathering, not transportation.  80 Fed. Reg. at 624 (AR 788); *see also Kerr-McGee Corp.*, 147 IBLA 277, 281 (1999) ("Gathering means the movement of lease production to a central accumulation and/or treatment point on the lease ... or ... off the lease ....") (quoting 30 C.F.R. § 206.151 (1995)).  ONNR explained the issue was that "[u]nder the Deep Water Policy, ONRR considered a subsea manifold located on the OCS in deep water to be a 'central accumulation point' **regardless of whether it was actually a central accumulation or treatment point**." *Id.* (emphasis added).  Thus, since it "issued the Deep Water Policy, lessees have been deducting the costs of moving bulk production from the subsea manifold to the platform where the oil and gas first surface," and lessees have even "attempted to expand the Deep Water Policy to deem subsea wellheads 'central accumulation points' and take transportation allowances from the sea bed floor to the first platform where the bulk production surfaces." *Id.*  In changing its position and canceling the Deep Water Policy, ONRR explained that it believes this production movement is more accurately classified as non-deductible gathering instead of deductible transportation. *Id.* That is, the "central accumulation point" is the first platform.  ONRR "determined that the

Deep Water Policy is inconsistent with our regulatory definition of gathering and Departmental decisions interpreting that term." *Id.*; *see Kerr-McGee*, 147 IBLA at 282 ("Kerr-McGee's gas was accumulated and rendered marketable at the processing platforms … and [] the gas was sold at those locations…. Accordingly, Kerr-McGee's gas was not marketable prior to arriving at [the platforms], and the pipelines by which it arrived there are properly considered 'gathering' lines.")

ONRR explained why it decided it was better to cancel the Deep Water Policy. ONRR concluded the policy has largely served its original purpose of incentivizing deepwater leasing and development. 81 Fed. Reg. at 43340 (AR 73966). It also determined, "Rescinding this policy clarifies the meaning of gathering, which, in turn, provides a more consistent and reliable application of the regulations." *Id.* Finally, it estimated eliminating the Deep Water Policy would "provide industry with an administrative benefit because they will no longer have to perform" the calculation, which often entailed a "significant" cost as "industry has often hired outside consultants to calculate their subsea transportation allowances." *Id.* at 43364 (AR 73990).

In sum, ONRR announced its intention to rescind the Deep Water Policy by disallowing production movement from the wellhead or seafloor manifold to the first offshore platform to be deductible. It then provided a reasoned explanation underlying its decision to change, that being primarily to more closely reflect reality, be more consistent in its "gathering" definition, and its belief that the incentives associated with the Deep Water Policy were no longer justified. Finally, ONRR explained why it believes canceling the Deep Water Policy is better, to increase consistency and simplify the reporting

calculations. ONNR considered the relevant information and articulated a rational basis based on the relevant information for its decision to vacate the Deep Water Policy. An agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *Fox Television Stations*, 556 U.S. at 515 (emphases in original); *see also Encino Motocars, LLC v. Navarro*, 136 S.Ct. 2117, 2125-26 (2016). ONRR has done so here, and Petitioners have not established that ONRR acted arbitrarily or capriciously, abused its discretion, or exceed its lawful authority by rescinding the Deep Water Policy.

### 1.3     ONRR did not act arbitrarily and capriciously, abuse its discretion, or act unlawfully by implementing caps on transportation and processing allowances.

Petitioners next challenge ONRR's decision to place caps and restrictions on certain allowances applicable to federal oil and gas leases. Specifically, the 2016 Valuation Rule precludes lessees from taking a transportation allowance exceeding 50 percent of the value of the oil or gas. 30 C.F.R. §§ 1206.110(d)(1) (oil) (AR 74002), 1206.152(e)(1) (gas) (AR 74010). Additionally, it precludes lessees from taking a gas processing allowance that exceeds 66⅔ percent of the value of each gas plant product. 30 C.F.R. § 1206.159(c)(2) (AR 74013). These capped allowances existed previously, but the 2016 Valuation Rule took away ONRR's discretionary authority to approve allowances exceeding these limitations. *See, e.g.*, 80 Fed. Reg. at 614, 624 (AR 778, 788).

Petitioners contend these new hard limits prevent lessees from accounting for the

"reasonable and actual costs incurred." (Doc. 89 p. 56.) They argue,

> These newly inflexible caps are arbitrary and unreasonable because it is
> ineluctable that the Rule cannot yield value "at the lease" when it arbitrarily
> prohibits lessees from deducting the *full* reasonable and actual transportation
> costs from sales prices in distant markets, or the *full* reasonable and actual
> processing costs from the enhanced value of post-processing gas plant
> products.

(*Id.* p. 57 (emphases in original).)

In the January 2015 Proposed Rule, ONRR explained its decision to hard cap the

transportation allowances as follows:

> To ensure a fair return to the public and to limit ONRR's administrative costs
> to process such requests [for exception], the proposed regulation eliminates
> the exception to the 50-percent limit. ONRR believes the current 50-percent
> limit on transportation-related costs is adequate in the vast majority of
> transportation situations.

80 Fed. Reg. at 624 (AR 788). ONRR's rationale concerning gas processing allowances

was similar:

> ONRR believes the current 66⅔ percent limit on processing-related costs is
> adequate in the vast majority of situations. To date, we only have approved
> two extraordinary processing cost allowances. Given the age of the plants
> and improvements in technology, ONRR believes such extraordinary cost
> allowances no longer reflect current conditions. Furthermore, ONRR
> believes the current 66⅔ percent limitation on gas plant products ensures a
> fair return to the public.

*Id.* at 627 (AR 791).

Further, in the Final Rule, ONRR expressly addressed the industry's argument that

the absence of the exception denies lessees the ability to deduct its actual and reasonable

transportation costs. It noted that both the MLA and OSCLA require royalty payments of

at least 12.5 percent "in amount or value of production." 81 Fed. Reg. at 43343 (AR

73969).  As noted previously, "value" is not defined, "which gives the [DOI] Secretary considerable discretion to define the term 'value.'" *Id.*  ONRR exercised its discretion by permitting these allowances, and it exercised the same discretion in capping the allowances.  *Id.*  Determining what is a reasonable allowance is within ONRR's expertise.

The Court finds it significant that a stated goal of the 2016 Valuation Rule was to "offer greater simplicity, certainty, clarity, and consistency" in valuing production.  81 Fed. Reg. at 43338 (AR 73964).  Eliminating case-by-case exceptions for transportation and gas-processing allowances reasonably advances this stated goal.

ONRR displayed awareness that it was changing these transportation and gas processing allowance provisions to create hard limitations and eliminate previously-available, case-by-case exceptions.  It explained that doing so conformed better to "the vast majority of [industry's] situations" while still balancing a fair return of royalty for the public.  The new limits also simplify both ONRR's and the industry's administrative burdens by eliminating application for and consideration of case-by-case exceptions. ONRR considered the relevant information and articulated a rational basis for its decision, which is all the law requires.  The changes are permissible under ONRR's authority, ONRR has expressed good reasons for the changes, and ONRR explained why it believes the changes are better.  Petitioners have not established that ONRR acted arbitrarily or capriciously, abused its discretion, or exceeded its lawful authority by disallowing exceptions to its transportation and gas-processing allowances.

### 1.4  ONRR did not act arbitrarily and capriciously, abuse its discretion, or act unlawfully by implementing a new index pricing option for non-arm's-length gas transfers.

In the 2016 Valuation Rule, ONRR implemented a new method for valuing gas sold in a non-arm's-length transaction. In brief, the new method requires producers to value such gas for royalty purposes equivalent to the "highest reported monthly bidweek price" for the production month, based on available index pricing points published in an ONRR-approved publication. 30 C.F.R. §§ 1206.141(c) (unprocessed gas), 1206.142(d) (processed gas). Petitioners argue this new method extracts "an arbitrarily inflated premium," improperly ignores "how gas actually flows and is sold," and is akin to a "convenience fee." (Doc. 89 p. 61.)

It is significant that the 2016 Valuation Rule first allows producers to value their gas under their or their affiliate's (or their affiliate's affiliate's, etc.) first arm's-length sale. 30 C.F.R. §§ 1206.141(b), 1206.142(c). "The first arm's-length sale may occur immediately, or may follow one or more non-arm's-length transfers or sales of the gas." 80 Fed. Reg. at 617 (AR 781). This conforms to the well-accepted principle that the "values established in arm's-length transactions are the best indication of market value." 81 Fed. Reg. at 43346 (AR 73972); *see E. I. du Pont de Nemours & Co. v. Collins*, 432 U.S. 46, 59 (1977) ("in a market economy, the value of any commodity is no more nor less than the price arm's-length bargainers agree on") (Brennan, J., dissenting). Thus, where an arm's-length sale occurs, immediately or eventually, gas will only be valued under the index pricing option where the lessee affirmatively elects such (for example, to avoid the administrative costs of tracing though numerous non-arm's-length transfers prior to the first arm's-length sale). 80 Fed. Reg. at 617 (AR 781).

The index pricing option "is based on publicly available index prices less a specified deduction to account for processing and transportation costs." *Id.* Petitioners argue the index pricing option is (1) over-inflated because it employs the highest index price, and (2) unrealistic because it requires the use of the highest available index price even if the gas did not actually go to that indexing price point. ONRR advanced this pricing option because it "simplifies the [former] valuation methodology and provides early certainty" for both ONRR and the royalty reporter. *Id.* In the Final Rule, ONRR explained why it believes using the "highest reported monthly bidweek price" is not unreasonably inflated:

> The value under an index-based valuation option is reasonable and justified because of the benefits that it affords to the lessee. Lessees have the burden of showing that none of the costs that they incur and deduct are costs to place their gas production in marketable condition. *Burlington Res. Oil & Gas Co. LP v. U.S. Dep't of the Interior*, No. 13-CV-0678-CVE-TLW, 2014 WL 3721210, at *12 (N.D. Okla. July 24, 2014). This burden includes separating or "unbundling" costs associated with putting production in marketable condition as discussed in *Burlington*. If the lessee chooses to use the index-based option, it will relieve the lessee of those responsibilities.

81 Fed. Reg. at 43347 (AR 73973). In other words, ONRR concluded the administrative savings available to lessees who use the index pricing option fairly offset the use of the "highest reported monthly bidweek price" as the valuation point, even if the lessee was not able to actually sell its gas based on that index price.

> This provision protects the interests of the Federal lessor, while also simplifying the royalty reporting process for industry. If this rule required a lessee to calculate royalty on the basis of the index pricing point(s) to which the gas did flow, we would require companies to trace production, potentially through a series of affiliated transactions, and determine what volumes of gas flowed to which index pricing points. This increases the burden for both industry and us. We retained this provision in the final rule because it is consistent with the administrative simplicity that the index-based method seeks to achieve.

*Id.*

Finally, Petitioners contend the 2016 Valuation Rule's fixed adjustments to the index prices are arbitrary and too limited. (Doc. 89 pp. 63-65.) "Under the Rule, to arrive at royalty value for their produced gas, onshore lessees must reduce the applicable index price by 10 percent, and OCS lessees must employ a 5 percent reduction, but in no event may the reduction be less than 10 cents per MMBtu or more than 30 cents per MMBtu," and "lessees 'may not take any other deduction' under the Rule's index methodology." (*Id.* p. 64 (citing 30 C.F.R. § 1206.141(c)(1)(iv) and quoting 30 C.F.R. § 1206.141(c)(2).)

ONRR provided these reductions to account for transportation costs because "index pricing points are normally located off of the lease and, frequently, are at lengthy distances from the lease." 81 Fed. Reg. at 43346 (AR 73972). It also "analyzed transportation rate data ... and determined that the rates, as proposed, are a reasonable reduction to the index price." *Id.*; *see also* 80 Fed. Reg. at 618 (AR 782) ("ONRR proposes these percent reductions based on the average gas transportation rates that lessees have reported to ONRR from 2007 through 2010 for OCS and all other areas.").

ONRR provided a reasoned explanation for the creation and scope of this index pricing option. While this valuation option does not fully represent the realities of the situation, ONRR freely admitted certain estimates and allowances were necessarily included. And these estimates and allowances were not arbitrary and were advanced with supporting data and reasons after a full consideration of the matter and the many comments to the proposed change. This is all that is required of ONRR. It considered the relevant

information and articulated a rational basis for its decision.  Promulgating the index pricing

option in its current form is permissible under ONRR's authority, ONRR expressed good

reasons for its creation and its scope, and it explained why it believes the index pricing

option is superior to the discontinued valuation methodologies.  Petitioners have not

established that ONRR acted arbitrarily or capriciously, abused its discretion, or exceeded

its lawful authority by advancing the index pricing option in its current form for valuing

non-arm's-length transfers of gas.

### 1.5  ONRR did not act arbitrarily and capriciously, abuse its discretion, or act unlawfully by requiring written, signed contracts.

The 2016 Valuation Rule required a lessee or its affiliate to "make all contracts,

contract revisions, or amendments in writing, and all parties to the contract must sign the

contract, contract revisions, or amendments" for all valuation methods.  30 C.F.R. §§

1206.104(g)(1) (federal oil sales); 1206.143(g)(1) (federal gas sales); 1206.253(g)(1)

(federal coal sales); 1206.453(g)(1) (Indian coal sales).  This requirement also applies to

transportation and processing contracts.  *See, e.g.,* 30 C.F.R. §§ 111(d) (federal oil

transportation); 30 C.F.R. § 1206.153(d) (federal gas transportation).  If a lessee or affiliate

fails to meet this requirement, ONRR may determine the value of the production (or the

transportation or processing allowance) under its default provisions.  81 Fed. Reg. at 43342

(AR 73968).  Petitioners contend this requirement fails to reflect "modern real world

business practices."  (Doc. 89 p. 66.)  Moreover, argue Petitioners, this requirement

contradicts the law, which recognizes the enforceability of oral and unsigned agreements.

*(Id.)*

ONRR discussed this new signed writing requirement in its January 2015 Proposed Rule:

> Lessees should provide to ONRR the actual, written contracts signed by all parties because those contracts document the very transactions on which the regulations require lessees to base values and allowances. Without the applicable sales, transportation, and/or processing contracts, neither the lessee nor ONRR can verify that Federal Royalties are properly paid.

80 Fed. Reg. at 622 (AR 786). And in the Final Rule, it responded to Petitioners' criticism thusly:

> We have the responsibility of auditing gross proceeds in order to ensure that they reflect the total consideration actually transferred, either directly or indirectly, from the buyer to the seller. Through this auditing process, we have found it difficult to verify the accuracy of lessees' royalty payments when the lessees enter into oral contracts.
>
> * * *
>
> Tracking email exchanges, letters, or other confirmations creates inefficiencies in our accounting and auditing systems, which limits our ability to fulfill FOGRMA's mandate to verify and account for royalty payments.

81 Fed. Reg. at 43342 (AR 73968).

As the Court previously said concerning this new signed writing requirement, "While this requirement may be unwieldy and problematic for lessees, ONRR has asserted good reasons underlying it. 'The Court is not free to second guess or review the *wisdom* of the agency's decision.'" *Cloud Peak*, 415 F. Supp. 3d at 1049 (quoting *Colorado Envtl. Coal. v. Salazar*, 875 F. Supp. 2d 1233, 1243 (D. Colo. 2012) (emphasis in *Salazar*)). ONRR explained that requiring written, signed contracts will greatly assist it in carrying out its statutory duty to collect and audit royalty payments. ONRR acknowledges that oral

contracts remain enforceable under the law, 30 C.F.R. § 1206.20, but ONRR desires a written, signed contract to accurately execute its accounting obligations. Petitioners disagree with ONRR's reasons underlying this new requirement, but those reasons are sufficient to show ONRR has not acted arbitrarily or exceeded its lawful authority in implementing the signed writing requirement.

Petitioners also attack the provisions that allow ONRR to ignore a written, signed contract and determine the value of certain production under the default provision where the oil or gas sales price is "unreasonably low." (Doc. 89 pp. 67-69.) The 2016 Valuation Rule provides that ONRR may determine the value of production where:

> You have breached your duty to market the oil for the mutual benefit of yourself and the lessor by selling your oil at a value that is unreasonably low. ONRR may consider a sales price to be unreasonably low if it is 10 percent less than the lowest reasonable measures of market price including, but not limited to, index prices and prices reported to ONRR for like-quality oil.

30 C.F.R. § 1206.104(c)(2); *see also* 30 C.F.R. § 1206.143(c)(2) (as to sales of gas, residue gas, and gas plant products). The Rule includes similar provisions concerning oil and gas transportation or processing agreements that are "unreasonably high." 30 C.F.R. §§ 1206.110(f)(2) (oil transportation); 1206.152(g)(2) (gas transportation); 1206.159(e)(2) (gas processing). Petitioners argue this presents no standard at all, and "[w]hile ONRR need not blindly accept every arm's-length contract, the unchecked discretion afforded by these Rule provisions broadly undercuts arm's-length agreements and the certainty that is critical to lessees' royalty valuation." (Doc. 89 p. 69.) Petitioners also challenge the default valuation provisions themselves (Doc. 89 pp. 99-107), which the Court will address below. The current discussion concerns the sections allowing ONRR to implement the

default provisions based on "unreasonably low/unreasonably high" contracts.

Petitioners largely argue about the "10 percent threshold." (Doc. 89 pp. 68-69.) Their concerns are unpersuasive. "The 10-percent variance that we *may* use in our analysis of transportation transactions is nothing more than a tolerance to help determine a proper transportation allowance." 81 Fed. Reg. at 43341-42 (AR 73967-68) (emphasis in original). Petitioners' argument about the consequences of being "10.1 percent below what ONRR deems the 'the lowest reasonable value'" (Doc. 89 p. 68) is speculative and based more in hysteria than fact. The 10-percent is a guide for ONRR, and Petitioners have not shown it to be an unreasonable guide.

ONRR provided appropriate reasons for implementing the written, signed contract requirement and the "unreasonably low/unreasonably high" default trigger. ONRR considered ways to better implement its statutory collection and auditing duties while ensuring accurate royalties are paid, and it rationally decided on these. Neither is ONRR's "unreasonably low" determination untethered, as it is tied to the lowest reasonable measures of market price. Petitioners have not shown that ONRR acted arbitrarily or capriciously, abused its discretion, or exceeded its lawful authority by promulgating the signed writing requirement for contracts and the default valuation trigger for "unreasonably low" valuations or "unreasonably high" allowances.

### 1.6  The 2016 Valuation Rule's "default provisions" are not arbitrary or unlawful as to oil and gas.

The 2016 Valuation Rule includes several "default provisions," which allow ONRR to value production or determine allowances when triggered. As noted above, one example

of this is where ONRR determines a lessee has valued its production for royalty purposes at an "unreasonably low" price. ONRR would then value the commodity, considering any information it deems relevant to such valuation. *See, e.g.*, 30 C.F.R. §§ 1206.105 (federal oil default provision), 1206.144 (federal gas default provision). Petitioners contend this affords ONRR "unbridled discretion to determine value and no safeguards against arbitrariness." (Doc. 89 p. 101.)

This Court already noted that the default provisions "give ONRR a great deal of discretion." *Cloud Peak*, 415 F. Supp. 3d at 1048. But it also noted this discretion comes from the "rather sweeping authority" Congress granted the DOI Secretary "to prescribe necessary and proper rules and regulations and to do any and all things necessary to carry out and accomplish the purposes of [the leasing statutes]." *Id.* (quoting *Indep. Petroleum Ass'n of Am. v. DeWitt*, 279 F.3d 1036, 1039 (D.C. Cir. 2002)). The Court finds it significant that the default provisions are not a standard valuation method; they are a fallback for when the standard methods for valuation or auditing fail.

> The default provision addresses valuation situations where circumstances result in the Secretary of the Interior's (Secretary) inability to reasonably determine the correct value of production. Such circumstances include, but are not limited to, the lessee's failure to provide documents, the lessee's misconduct, the lessee's breach of the duty to market, or any other situation that significantly compromises the Secretary's ability to reasonably determine the correct value. The mineral statutes and lease terms give the Secretary the authority and considerable discretion to establish the reasonable value of production by using a variety of discretionary factors and any other information that the Secretary determines is relevant. The default provision simply codifies the Secretary's authority to determine the value of production for royalty purposes and specifically enumerates when, where, and how the Secretary will use that discretion.

\* \* \*

> Some commenters contend that ONRR did not perform an adequate economic analysis in assigning a royalty impact to invoking the default provision. We disagree and emphasize, again, that we anticipate using the default provision only in very specific cases where we cannot determine proper royalty values through standard procedures.

81 Fed. Reg. at 43341 (AR 73967).

Moreover, the default provisions do not give ONRR unbounded discretion to make up valuations out of thin air. "[T]he default provision will always establish a reasonable value of production **using market-based transaction data**, which has always been the basis for our royalty valuation rules." *Id.* (emphasis added). And a lessee's right to challenge a valuation determined by ONRR remains available.

> Some industry commenters expressed concerns over their ability to challenge our use of the default provision. Industry's concerns are unwarranted because a company may appeal an order, including an order wherein we used the default provision to determine royalty value. Appeal rights under 30 CFR part 1290 will not change under this final rule.

*Id.*

In sum, under 30 U.S.C. § 1711 Congress delegated to ONRR a substantial amount of responsibility to collect and audit royalty payments, along with a substantial amount of discretion to accomplish the task. *Devon Energy Corp. v. Kempthorne*, 551 F.3d 1030, 1033 (D.C. Cir. 2008) ("In the Federal Oil and Gas Royalty Management Act, the Secretary of the Interior was instructed by Congress to create a comprehensive inspection, collection, accounting, and auditing system to ensure that the government receives the royalties owed."). The default provisions constitute a reasonable fallback method within ONRR's discretion that allows it to meet its statutory obligations when the primary valuation

methodologies fail. ONRR considered the many comments concerning the default provisions and provided rational reasons for adopting the default provisions. Petitioners have not shown that ONRR acted arbitrarily or capriciously, abused its discretion, or exceeded its lawful authority by enacting the default provisions in the 2016 Valuation Rule.

2.  **As to federal and Indian coal, Petitioners have shown the coal-valuation provisions in the 2016 Valuation Rule are arbitrary and capricious, beyond statutory authority, and generally unworkable.**

As with the preliminary injunction, the result is different when it comes to the federal and Indian coal provisions. Previously, the Court found the provision "requiring lessees to value coal based on the gross proceeds of electricity sales (when there is no prior arm's-length sale) is likely to be found contrary to law or arbitrary and capricious on the merits." *Cloud Peak*, 415 F. Supp. 3d at 1051. After determining that enjoining "only the subsections that contemplate using electricity sales to value coal" appeared likely "to cause more problems than it solves," the Court preliminarily enjoined the 2016 Valuation Rule's "application as to all facets of coal valuation." *Id.* at 1052-53.

Federal Respondents now concede that several coal-specific provisions in the 2016 Valuation Rule are problematic and unworkable. (Doc. 87; Doc. 97 pp. 46-56.) They say the Court went too far, though, and only certain electricity-based-valuation provisions should be excised rather than the entire coal-valuation methodology. (Doc. 87 p. 3; Doc. 97 pp. 46-56.) Of course, Petitioners contend all coal-valuation provisions of the 2016 Valuation Rule (and the entire rule itself) should be struck down. (Doc. 106 pp. 28-38; Doc. 95.) Respondent-Intervenors contend the Court erred by preliminarily enjoining any part of the coal-valuation methodology and ask that the entire 2016 Valuation Rule be

upheld. (Doc. 102 pp. 48-71.)

Respondent-Intervenors' arguments are unpersuasive. The Court's previous concerns with using electricity sales to value the price of coal continue.

Several problems are inherent in valuing coal based on the sale of electricity, but the Court will only discuss two of the more glaring problems to serve as examples. First, "an electricity utility's power supply portfolio typically includes a range of options, from nuclear to coal to natural gas to hydro, wind, and solar." Jim Rossi, *The Shaky Political Economy Foundation of a National Renewable Electricity Requirement*, 2011 U. Ill. L. Rev. 361, 369 (2011). The electricity sold to consumers is generated from multiple sources, not just coal. Thus, the sales price of the electricity is comprised of much more than just the cost of coal, and that's ignoring the rabbit hole that is electricity sales regulation by both the federal and state governments. Trying to value coal based on the sale of electricity is akin to valuing wheat based on the sale of a cake; there may be a relationship between the two, but it is weak and several other factors potentially play a much larger role in determining the sales price of the end product. In response to comments, ONRR noted, "Opponents argued that valuing coal using electric sales was a violation of the MLA, ignored and oversimplified the complexities of electric markets and contracts, and was administratively burdensome." 81 Fed. Reg. at 43355. While ONRR refuted it was in violation of the Mineral Leasing Act, citing 30 U.S.C. § 207, ONRR offered no response to the contention that it ignored and oversimplified the complexities of electric markets. **Moreover, at the September 4, 2019 hearing, none of the parties could articulate how this provision could be applied to extract the value of the coal from the sale of electricity, a highly-regulated commodity.**

Second, coal delivered to a power plant may sit in storage and not be burned to generate electricity until well after the lessee is required to report the value of that coal to ONRR for royalty-calculation purposes. *See Herman v. Associated Elec. Co-op., Inc.*, 172 F.3d 1078, 1088 (8th Cir. 1999) ("The refuse and coal was screened, sized, crushed, and stored until it was fed into boilers to produce electricity and steam."). This renders it impossible to value the coal based on the sales price of electricity because there's no relationship between the two at the time the report to ONRR is due. This further creates the issue of whether ONRR is in fact requiring "payment of a royalty ... of not less than 12 ½ per centum of *the value of coal,*" 30 U.S.C. § 207(a) (emphasis added), or, contrary to ONRR's statutory authority, requiring payment of royalty based upon the value of electricity.

*Cloud Peak*, 415 F. Supp. 3d at 1050–51 (bold added). At the core of the Court's concerns is the functional difficulty (if not sheer impossibility) of valuing coal based on the altogether different, and highly regulated, commodity of electricity. Now having the benefit of full briefing and the administrative record before it, the Court remains convinced that

> [b]asing the value of coal on the sales prices of electricity and failing to discuss the serious complications and complexities suggests ONRR either exceeded its statutory authority, failed to consider an important aspect of the problem, contradicts the evidence before the agency, or is so implausible that it cannot be explained by a difference in view or the product of agency expertise.

*Id.* at 1051. It is also significant that the parties responsible for paying royalties (Petitioners) and collecting royalties (ONRR) all agree with this assessment, and the only parties in disagreement (Intervenor-Respondents) do neither.

Consequently, Federal Respondents contend, and the Court agrees, the following electricity-based-valuation provisions must be vacated from the 2016 Valuation Rule:

(1)     The definition of "coal cooperative" from 30 C.F.R. § 1206.20;

(2)     The phrase "one of the following applies" from 30 C.F.R. § 1206.252(b);

(3)     30 C.F.R. § 1206.252(b)(1) and (b)(2), but retaining subsections (b)(2)(i) through (b)(2)(iii);

(4)     30 C.F.R. § 1206.252(c);

(5)     The phrase "including, but not limited to, the price of electricity" from 30 C.F.R. § 1206.254(b);

(6)     The phrase "one of the following applies" from 30 C.F.R. § 1206.452(b);

(7)    30 C.F.R. § 1206.452(b)(1) and (b)(2), but retaining subsections (b)(2)(i) through (b)(2)(iii);

(8)    30 C.F.R. § 1206.452(c); and

(9)    The phrase "including, but not limited to, the price of electricity" from 30 C.F.R. § 1206.454(b).

(*See* Doc. 88-1); *see also* 5 U.S.C. § 706(2)(A), (C) (a reviewing court "shall … hold unlawful and set aside agency action … found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law [or] in excess of statutory jurisdiction, authority, or limitations"); *Wyoming v. United States Dep't of the Interior*, 493 F. Supp. 3d 1046, 1085 (D. Wyo. 2020) ("Except in limited circumstances, vacatur is the typical and appropriate remedy under the APA for unlawful agency action.").

The issue now becomes whether any of the remaining coal-valuation provisions of the 2016 Valuation Rule must also be vacated. *See High Country Conservation Advocs. v. U.S. Forest Serv.*, 951 F.3d 1217, 1228-29 (10th Cir. 2020) ("a court 'may partially set aside a regulation if the invalid portion is severable,' that is, 'if the severed parts operate entirely independently of one another, and the circumstances indicate the agency would have adopted the regulation even without the faulty provision.'") (quoting *Ariz. Pub. Serv. Co. v. U.S. E.P.A.*, 562 F.3d 1116, 1122 (10th Cir. 2009)).  The Court finds the decision is largely controlled by the remaining functionality of the Rule's coal-valuation methodology.  After considering the parties' full merits briefing and the entire record, the Court continues to find that severance of only the electricity-based-valuation provisions "would appear to cause more problems than it solves," *id.* at 1052, and would leave the coal-valuation methodology arbitrary and unworkable in practice.

Under the 2016 Valuation Rule, the primary method for valuing coal is to base it on the first arm's-length sale. Where the lessee first transfers the coal in a non-arm's-length transaction, though, the preferred methodology becomes a netback calculation based on the gross proceeds accruing to the affiliate "under the first arm's-length contract" less applicable transportation and washing allowances. 30 C.F.R. §§ 1206.252(a) (federal coal); 1206.452(a) (Indian coal). This methodology replaced the former "benchmark" valuation system in circumstances where the lessee first transferred the coal in a non-arm's-length transaction. Under the 2016 Rule, the lessee would trace the coal through the non-arm's-length transfers to the first arm's-length sale and then determine the coal's value on that sale (less applicable deductions).

The Court does not find this netback provision particularly troubling. "[A]n arm's-length sale has been historically accepted as an accurate measurement of an item's value." *Cloud Peak*, 415 F. Supp. 3d at 1052; *see also* 76 Fed. Reg. 30878, 30879 (May 27, 2011) ("The Department of the Interior has long held the view that the prices agreed to in arm's-length transactions are the best indication of market value."). The following comments from ONRR in the July 2016 Final Rule are reasonable and support this coal-valuation provision:

> The best indication of value is the gross proceeds received under an arm's-length contract between independent persons who are not affiliates and who have opposing economic interests regarding that contract. The best indicator of value under a non-arm's-length sale is the gross proceeds accruing to the lessee or its affiliate under the first arm's-length contract, less applicable allowances.

81 Fed. Reg. at 473339 (AR 73965). Moreover, this coal-valuation method appears

consistent with how lessees are required to value oil and gas. *See* 30 C.F.R. §§ 1206.52(a);

1206.141(b); 1206.142(c); 81 Fed. Reg. at 43354 (AR 73980) ("Consistent with how we

require lessees to value other commodities, we are requiring lessees to value non-arm's-

length dispositions of Federal coal at the first arm's-length sale.").

The problem occurs where there is never a "first arm's-length sale" of the coal. If

the Court were to vacate only the electricity-based-valuation provisions, the remaining

coal-valuation provisions would effectively provide little to no guidance for lessees to

value coal never transferred at arm's-length. Where the non-arm's-length coal is burned

at a power plant to generate electricity, the lessee "must propose to ONRR a method to

determine the value using the procedures in § 1206.258(a)." 30 C.F.R. §§

1206.252(b)(2)(i) (federal coal), 1206.452(b)(2)(i) (Indian coal). The lessee then must use

that proposed method to value its coal for royalty purposes, and ONRR will later determine

whether the proposed valuation methodology is appropriate. 30 C.F.R. §§

1206.252(b)(2)(ii) through (b)(2)(iii) (federal coal), 1206.452(b)(2)(ii) through (b)(2)(iii)

(Indian coal); *see also* 81 Fed. Reg. at 43366 (AR 73992) ("If we were unable to establish

royalty values of Federal coal using the sales value of electricity generated from coal

produced, royalty value will be based on a method that the lessee proposes under §

1206.252(b)(2)(i), which we approve, or on a method that we determine under § 1206.254

[default provision for federal coal]."). This provides the lessee with no clear, consistent

standard to anticipate its royalty obligations and make business determinations.

Despite ONRR's assertion that it "seek[s] a clear, consistent, and repeatable

standard for valuing coal at its true market value," 81 Fed. Reg. at 43339 (AR 73965), this

"propose-to-us-a-methodology" offers a lessee no standard to follow for non-arm's-length coal that was burned to generate electricity. Petitioners correctly contend, "The Rule would afford no methodology for valuing such coal, instead forcing coal lessees to make case-by-case proposals to ONRR and subjecting them to the default provisions." (Doc. 106 p. 45.) This lack of guidance also fails to fulfill the statutory requirement that a coal lease "shall require payment of a royalty in such amount as the Secretary shall determine of not less than 12½ per centum of **the value of coal as defined by regulation**[.]" 30 U.S.C. § 207(a) (emphasis added). After vacating the electricity-based-valuation provisions in the 2016 Valuation Rule, ONRR effectively says, "For non-arm's-length coal used to generate electricity, the lessee must tell us how to value the coal, and we'll determine later whether the lessee was correct." This cannot be said to provide a "clear, consistent, and repeatable standard for valuing coal at its true market value." It is particularly problematic because, as Federal Respondents readily point out, "Lessees are responsible, in the first instance, for accurately calculating and paying royalties." (Doc. 97 p. 12 (citing *BP Am. Prod. Co. v. Burton*, 549 U.S. 84, 88 (2006).) Absent sufficient guidance, lessees will struggle to meet this obligation. And this is not to mention the apparent gap in the regulations concerning coal that is (1) never transferred at arm's-length and (2) not used to generate electricity. *See* 30 C.F.R. § 1206.252; *see also* Doc. 89 p. 92 ("When a coal lessee or its affiliate does not sell coal at arm's-length and the netback from electricity does not apply, the 2016 Rule does not specify any valuation method.").

The Court concludes the lack of guidance, arbitrariness, and practical unworkability of the 2016 Valuation Rule's coal-valuation methodology cannot be cured through a

selective line-item veto.  As at the preliminary-injunction stage, the Court determines the 2016 Valuation Rule cannot be given effect as to its coal-valuation provisions.  The provisions specific to the valuation of federal and Indian coal must be vacated.

## CONCLUSION AND ORDER

ONRR has been delegated substantial authority by Congress in determining the means and methods to value and collect royalties.  As has long been recognized by the Supreme Court in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984):

> an agency to  which Congress has delegated policy-making  responsibilities may, within the limits of that delegation, properly rely upon the incumbent administration's views of wise policy to inform its judgments. While agencies are not directly accountable to the people, the Chief Executive is, and it is entirely appropriate for this political branch of the Government to make such policy choices—resolving the competing interests which Congress itself either inadvertently did not resolve, or intentionally left to be resolved by the agency charged with the administration of the statute in light of everyday realities.
>
> When a challenge to an agency construction of a statutory provision, fairly conceptualized, really centers on the wisdom of the agency's policy, rather than whether it is a reasonable choice within a gap left open by Congress, the challenge must fail.   In such a case, federal judges—who have no constituency—have a duty to respect legitimate policy choices made by those who do. The responsibilities for assessing the wisdom of such policy choices and resolving the struggle between competing views of the public interest are not judicial ones: "Our Constitution vests such responsibilities in the political branches." *TVA v. Hill*, 437 U.S. 153, 195, 98 S.Ct. 2279, 2302, 57 L.Ed.2d 117 (1978).

*Id.* at 865-66.  While not the ideal way to function given the sometimes dramatic policy shifts every four to eight years, the reality under *Chevron* is, as the Government-Respondent asserts, "[i]nherent within the modern administrative state is the Executive

branch prerogative to define and make changes in policy." (Doc. 97 p. 9.)  So it must be.

Nonetheless, Petitioners have established the coal-valuation provisions of the 2016 Valuation Rule must be vacated under the APA as arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law.  However, the oil-valuation and gas-valuation provisions have not been shown to be in violation of the APA or other law and should not be set aside.  Further, the oil-valuation and gas-valuation provisions are readily severable from the coal-valuation provisions, as has been the practice since this Court entered the partial preliminary injunction in October 2019.

**IT IS THEREFORE ORDERED** that the federal and Indian coal-valuation provisions of the 2016 Valuation Rule are hereby **VACATED**.  As the coal-specific 2016 Valuation Rule provisions have never been put into practice (due to the earlier preliminary injunction), the pre-2016 valuation methodologies for federal and Indian coal shall continue to govern.

**IT IS FURTHER ORDERED** that the federal oil-valuation provisions and Federal gas-valuation provisions of the 2016 Valuation Rule are hereby **UPHELD**.

**IT IS FURTHER ORDERED** that Federal Respondents' Motion for Final Judgment (Doc. 87) is hereby **DENIED AS MOOT** based on the Court's full review of the matter here.

**DATED:** September ____8____, 2021.

Scott W. Skavdahl
United States District Judge